Carlos MORALES FELICIANO,
et al., Plaintiffs,

v.

Pedro ROSSELLÓ GONZÁLEZ,
et al., Defendants.

No. CIV. 79–4(PG).

United States District Court,
D. Puerto Rico.

May 18, 1998.

Carlos García Gutiérrez, San Juan, PR, for Plaintiffs.

Luis F. Del Valle Emmanuelli, Federal Litigation Division, Department of Justice, San Juan, PR, for Defendants.

### OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

1. On March 10, 1997, the court entered an order appointing Vincent M. Nathan, Esq., the former Court Monitor, as an expert witness pursuant to Rule 706, Fed. R. Ev., to prepare a report that would update the record in this case and document the state of compliance with the court's orders. The court directed Mr. Nathan to submit a report on medical and mental health care. Mr.

Nathan's report concluded that "there is virtually no likelihood that the defendants, left to their own devices, will ever achieve compliance with the court's orders in the areas of medical and mental health care or will ever provide services in these areas that comport with even the most basic constitutional requirements." *Report on Medical and Mental Health Care* at 39 (filed April 14, 1997, admitted in evidence over objection as CT Exhibit 13). Accordingly, Mr. Nathan recommended that the court appoint "a receiver with ample authority to manage the Correctional Health Program free of all constraints of Commonwealth law." *Id.* at 40. That report and recommendation set the stage for the instant proceedings.

2. The Court received motions from both the plaintiffs and the defendants opposing the court's expert witness's recommendation of a receiver. Motion to Submit Plaintiffs' Specific Alternative to the Court's Expert Witness' Recommendation that a Receiver Be Appointed to Resolve the Correctional Health Program Crisis (Dkt.6559, May 19, 1997); Supplemental Motion on Plaintiffs' Proposed Alternative to a Receivership for the Correctional Health Program (Dkt. 6590,

June 26, 1997); Final Supplement to Plaintiffs' Specific Alternative to the Court's Expert Witness' Recommendation that a Receiver Be Appointed to solve the Correctional Health Program Crisis (Plaintiffs' Alternative) (Dkt.6615, August 8, 1997); Defendants' Motion Requesting Additional Time to Address Plaintiffs' Alternative Recommendation to the Expert Witness' Report on the Correctional Health Program (Dkt.6565, May 30, 1997); Defendants' Supplement to Their Correctional Health Program Crisis Proposal (Dkt.6627, August 18, 1997). The Court scheduled a hearing to commence August 18, 1997, to address the recommendation and the current state of medical and mental health care in the prison system.[1] The Correctional Health Program is referred to as the Program or the CHP. After the hearing was concluded, the parties submitted a Plaintiff Class' and Defendants' Joint Proposal Concerning Correctional Health Program (September 26, 1997).

3. At the hearing, 13 witnesses testified. In general, the witnesses were distinguished professionals knowledgeable about the Puerto Rico prison system, and highly credible, with such exceptions as set out below.[2] In

---

1. The Court was concerned that the litigation positions of the parties, both of which opposed the expert witness' recommendations, might not result in a full airing of all the facts and circumstances relevant to its decision in this class action. Accordingly, the court appointed an attorney experienced in institutional reform litigation concerning prisons, John Boston, Esq., the Project Director of the Prisoners' Right Project of the Legal Aid Society of the City of New York (hereinafter "appointed counsel"), to assist in the development of the record at the hearing. Order, July 3, 1997 (Dkt.5532).

2. In the order of their presentation these witnesses were:

a. Ernesto Torres Arroyo, M.D., the Medical Director of the Bayamón Correctional Center, is a physician licensed in Puerto Rico and is certified as a specialist in emergency medicine. He testified without objection as an expert in general medicine and in emergency room procedures.

b. Angel Luis Ramos Casanova, M.D., the Medical Director of the Ponce Correctional Complex, is a physician licensed in Puerto Rico and is certified as a specialist in internal medicine. He testified without objection as an expert in internal medicine.

c. Rafael Guzmán Fonalledas, M.D., the Medical Director of the Río Piedras Correctional

Complex, is a physician and is certified as an emergency medicine specialist. Because the Executive Director of the CHP had resigned, the Chief Health Care Coordinator had also assigned Dr. Guzmán to the main CHP office to assume some responsibilities for all facilities. He testified without objection as an expert in general medicine and emergenciology.

d. Ana C. Bonet Rolón currently works at the Correctional Health Program as a Resources Consultant for the Chief Health Care Coordinator. She testified without objection as an expert in employment law, particularly in the management of personnel in the health care field, which encompasses correctional health.

e. Jorge Efren Ruiz–Román, M.D., is Director of the Infectious Control Program for the Correctional Health Program. He testified without objection as an expert in general medicine, infectious disease control, and epidemiology.

f. Lambert N. King, M.D., Ph. D., is the Medical Director/Senior Vice President for Medical and Academic Affairs at St. Vincent's Hospital and Medical Center of New York. He testified without objection as an expert in internal medicine, correctional health care, the administration of health care programs both in public institutions and for profit corporations, and in general

health care administration within an institutional setting. His resume shows him to be a distinguished national figure in correctional health care. He has extensive familiarity with this litigation and the prison system of Puerto Rico, having served as plaintiffs' expert since 1979, *see Feliciano v. Barcelo*, 497 F.Supp. 14, 21–30 (D.P.R.1979) and having been a member of the Joint Health Care Executive Committee and a participant in its 1996 strategic evaluation.

g. Aida Guzmán Font, M.D., is the Chief Health Care Coordinator of the Correctional Health Program, and has held that position since 1993. She testified without objection as an expert in health care delivery and psychiatry. Dr. Guzmán's acquaintance with this litigation began in 1980, after the court entered a preliminary injunction. At that time she was Assistant Secretary for Mental Health, and she remained involved with prison mental health services until she left that position in 1984. Her lengthy testimony was well informed, precise, knowledgeable, characterized by a thorough knowledge and understanding of present conditions in Puerto Rico's correctional institutions and the structures needed to set up and maintain a health care services delivery system. The testimony of this highly credible and knowledgeable witness carries great weight with the court and suffuses the findings of fact made in this Opinion and Order.

h. Magali Maldonado de Oms, M.D., M.P.H., is the President of Health Insurance and Administrative Services Consultants Corporation. She testified without objection as an expert on the administration of delivery of health care services in public and private sectors and on health care delivery through insurance programs. She has worked with the Chief Health Care Coordinator since October 1996 on issues related to the Correctional Health Program, and both plaintiffs and defendants have relied on her advice in formulating their proposals. Dr. Maldonado de Oms has extensive knowledge of public and private health care systems and a thorough knowledge of the health care delivery system being implemented at present by the government of Puerto Rico.

i. John Hubert Clark, Jr., M.D., M.P.H., the Chief Medical Officer of the Los Angeles County Sheriff's Department, is a physician licensed in the State of California and the State of Georgia. He testified, over plaintiffs' objection, as an expert in general medicine, correctional health services, and correctional health management administration and accreditation in the private as well as the public sectors. Despite his distinguished resume, Dr. Clark's testimony is entitled to less weight, and is therefore relied upon by the Court only exceptionally: nevertheless in some important respects he agreed with other witnesses.

Based on a weekend's visit to several prisons and a conversation with the CHCC; Dr. Clark had prepared a report, which was made available to counsel. Dr. Shansky and Dr. Aida Guzmán reviewed the report and agreed that it was generally superficial and inaccurate; Dr. Shan-

sky: "either misunderstanding of what was going on in the system or an understanding that was extremely superficial and not fully adequate"; Dr. A. Guzmán: "not thorough enough … did not cover all the areas and [...] he lacked the time to go into an in depth evaluation of our system"; See also T434–48, T450–51, T503 for Dr. Shansky's more detailed testimony.

Dr. Clark had concluded that "it is my opinion to a reasonable degree of medical certainty that the inmates incarcerated in the Puerto Rico Department of Corrections are receiving care that meets the minimal standards of the correctional health care profession." However, on cross examination at the hearing after having made a second brief visit to one prison and having listened to and read some of the hearing testimony, he abandoned this conclusion, conceding that "In the total context of the standards, the care is not adequate."

In general, Dr. Clark's testimony added little to the court's understanding. His acquaintance with the prison system was minimal compared with that of other witnesses who testified. Most of his testimony was either peripheral to the significant issues before the court or cumulative of the testimony of other witnesses, for whom he expressed much praise and little disagreement. Moreover, he expressed high regard for the testimony of Drs. Rafael Guzmán, Torres, and Ramos, and found nothing in their testimony that he thought was wrong. He agreed that Dr. Aida Guzmán, the CHCC, knows her program and stated that her leadership is "[s]econd to none." The testimony of these witnesses is far more useful and reliable than is Dr. Clark's.

j. William R. McNeill is an architect who works for Rosser International, a multi-discipline architectural engineering and program management firm that manages the Facilities Renovation Program. His testimony, not as an expert, referred to one of defendants' exhibits, which is no more than an estimate of costs for the construction and rehabilitation of facilities for the CHP. He also stated that in the past necessary funds have been available when needed.

k. The Hon. Manuel Diaz Saldaña was the Secretary of the Treasury of the Government of Puerto Rico, who testified without objection as an expert in financial management, public management, public policy on contracting, government purchasing, and the privatization process from the government standpoint.

l. Ronald M. Shansky, M.D., is a physician licensed in Illinois who is a consultant for corrections medicine and continuous quality improvement, a part-time surveyor for the Joint Commission on Accreditation of Healthcare Organizations, and Attending Physician for the Department of Medicine at Cook County Hospital in Chicago, Illinois. He also serves as court-appointed receiver for medical and mental health at the District of Columbia Jail. He testified without opposition as an expert in general medicine, internal medicine, and prison medical adminis-

addition to the testimony, close to seven hundred documentary exhibits were submitted by plaintiffs and stipulated by defendants including considerable statistical data concerning the operation of the Correctional Health Program. Additional documentary evidence was submitted on behalf of the Court's Expert Witness, without objection by the parties. Some documents were admitted over objection.

## I. FINDINGS OF FACT

4. The defendants in this litigation have been subject to court orders to improve the delivery of health care services to inmates dating back to the court's preliminary injunction of 1980. *Feliciano v. Barcelo*, 497 F.Supp. 14 (D.P.R.1980). The parties eventually stipulated to the Medical Care and Mental Health plans (together referred to below as the "Plans"). In 1990, the court approved the court monitor's Amended 62nd Report, the *Report Recommending Adoption of Revised Medical and Mental Health Plans,* which included the Plans. The court's order of approval also ordered defendants to implement the Plans to remedy almost a decade of non-compliance with the court's orders to provide constitutionally required health care. As a result, the Administrator of Correction and the Secretary of Health agreed to transfer the responsibility for correctional health services to the Department of Health. In 1986, after further hearings, the court found *inter alia* that the preliminary injunction had not been complied with. The court appointed Vincent M. Nathan, Esquire, as the Court Monitor, to monitor compliance with its orders, including those addressing medical and mental health care. *Morales Feliciano v. Romero Barcelo*, 672 F.Supp. 591 (D.P.R.1986).

5. In 1980, health care services within Puerto Rico's prisons were virtually nonexistent. There was one psychiatrist for the entire system, which had custody at that time of approximately 3,000 inmates. Mentally ill patients at Bayamón 308 were housed in what was known as the "máxima de locos" (maximum for crazies), where they received virtually no attention and the distribution of medication was carried out by other inmates. There were three, perhaps four physicians to provide medical services to the entire AOC inmate population. There were no licensed pharmacists in the system.

6. In 1988, the Administration of Correction entered into an agreement with the Department of Health by which correctional health services were to be rendered by Department of Health personnel. By 1993, the program under which such services were provided was just beginning to develop an identity of its own and was designated the Correctional Health Program. At the same time, the services at the institutional level were severely disorganized and understaffed and still relied upon unlicenced personnel. The services were not integrated and each "track" of services—e.g., nursing, mental health, etc.—responded to its own directors at the central office level. There was only one licensed pharmacist for all of the island's penal institutions. Medical records were disorganized and there was not even a rudimentary infectious disease control program. Quality improvement was very fragmented. Health education was done by a psychologist at the central level and was not being extended to the institutions. The administrative aspects of the program were being performed by a single secretary.

7. A 1990 report by the Court Monitor concluded, based on the assessments of two distinguished expert consultants, that "[a] number of conditions found and prohibited by the Court in 1980 persist throughout the

---

tration. He also has had extensive experience with the Puerto Rico prison system; he worked for the Office of the Court Monitor during 1991–93 and in 1993 was appointed to the Joint Health Care Executive Committee. He returned to Puerto Rico and consulted with the CHCC and other CHP staff and reviewed medical records shortly before the hearing.

m. Vincent M. Nathan, LL. B., the court's expert witness, is an attorney who has served as special master, monitor, or expert consultant to courts in a number of prison cases. In this litigation, he served from 1986 to 1995 as Court Monitor and from 1995 to 1996 as a joint expert consultant to the parties, and is extensively familiar with the Puerto Rico prison system. He testified without objection as an expert in correctional administration and operations generally as well as monitoring and formulating remedies in prison conditions.

correctional system, and the current medical and mental health delivery systems throughout the AOC endanger the lives and health of inmates and staff alike." *100th Report of the Court Monitor—Report on Delivery of Medical and Mental Health Care* (Dkt.2050, at 3, filed February 2, 1990, confirmed by order of June 14, 1990, Dkt. 2268). This conclusion, and the experts' findings, were not contested by the defendants and, indeed, came as no surprise. When the Court Monitor first introduced the consultants to the then Administrator of Corrections, Dra. Mercedes Otero de Ramos, she

> made clear her preference that the consultants not tell her what she already knew at the time—that systems for delivery of medical and mental health care to prisoners throughout Puerto Rico were in near total disarray. Rather, she requested that the consultants provide her with a plan containing proposed solutions to the problems that had been brought to her attention through prior evaluations and her own observations of the correctional system.

*Amended 62nd Report of the Court Monitor—Report Recommending Adoption of the Revised Medical Plan and Mental Health Plan* at 3 (filed December 13, 1989).

8. Both of the Court Monitor's consultants conferred extensively with representatives of the Administration of Correction and the Department of Health in the course of their work and submitted initial proposed plans for providing adequate medical and mental health care. These became the subject of extensive and cooperative discussion and revision among the parties and the Court Monitor that led to the Medical Care Plan and the Mental Health Plan ("the Plans") that were recommended to the court in the Amended 62nd Report. Neither party objected to any part of the Plans. On January 2, 1990, the court tentatively approved the Plans and directed the defendants to commence implementing them. Final approval was given by order dated October 23, 1990 (Dkt.2465), after the court completed the notice and review procedure required by Rule 23(e), Fed.R.Civ.P., which the court followed out of an abundance of caution.

9. Since their entry as orders, these Plans have been supplemented and modified by several further orders addressing certain medical and mental health care issues. *See* Order Approving Lambert King's Recommendations, December 18, 1992 (Dkt.4156); Order Confirming 213th Report of the Court Monitor—Report Conveying Medical Consultant's Findings of Site Visits Conducted April 25–28, 1992 and Appendix B of the Report, December 29, 1992 (Dkt.4166); Order amending § 58 of the Medical Care Plan, July 9, 1993 (Dkt.4537). At the hearing, the Correctional Health Care Coordinator praised the plans, and she was not alone in doing so.

**Goals of the Plans**

10. The principal goals of the Correctional Health Program, are fourfold: (1) integration of health services throughout the large and complex institutional system under the jurisdiction of the Administration of Correction; (2) to provide services commensurate with contemporary standards of professional practice of medicine, with emphasis on preventive services to the entire inmate population; (3) to guarantee accessibility for all inmates to the full range of health services available, including hospitalization, emergency services, and subspecialty facilities and clinics; and (4) to provide health education to the inmate population and correctional staff to improve the level of understanding of sound health and prevention of disease. The services addressed by the Plans include, in addition to direct medical services, all the supporting services necessary to operate an integrated health care system, including, among others, health education, quality improvement, diets, medical records, and administrative support. These goals and services reflect contemporary standards for the provision of adequate health services generally, whether within the free community or within a correctional setting. The general community standards of providing integrated health care services are embodied as well in the standards promulgated by the Joint Commission on Accreditation of Health Care Organizations (the "Joint Commission"). The Health Care Executive Committee had thus proposed the adoption of the standards of the Joint Commission as the benchmark

by which to evaluate correctional health services in Puerto Rico.

11. The court specifically finds that the four goals set out in the Plans are essential to any remedy for the elimination of the long-standing and present violation of plaintiffs' federal constitutional rights. Of special importance is the integration of health care services throughout all of the institutions operated, directly or under contract, by the Administration of Correction. While the parties, or the Chief Health Care Coordinator, may from time to time request modifications of the Plans to keep abreast of health care developments or to enhance administrative and fiscal efficiency, any changes must be shown to further these goals.

**Historic Noncompliance with the Plans**

12. Past and present defendants have not complied with the Plans, as documented in a series of motions and reports by the Court Monitor, as a result of which the court took a series of actions intended to facilitate compliance.

13. In the *202nd Report of the Court Monitor—HIV/AIDS Focused Study* (filed July 28, 1992, confirmed August 18, 1992; Dkt. 3839), the monitor found extensive noncompliance with the Medical Plan's requirements with respect to HIV care and concluded that defendants' failure "places HIV-positive prisoner's lives in peril." *Id.* at 27, Finding 31. The court directed the defendants to implement the report's recommendations.

14. In the *213th Report of the Court Monitor—Report Conveying Medical Consultant's Findings of Site Visits Conducted April 18–25, 1992* (filed September 21, 1992; Appendix B filed October 27, 1992; confirmed December 28, 1992; Dkt. 3966), the

monitor's consultants documented noncompliance with the Plans' requirements concerning intake screening, inadequately equipped medical facilities, inadequate staffing of facilities housing chronically ill patients, failure to provide medical diets, unavailability of correctional staff to escort inmates to medical appointments inside and outside the prison, etc.

15. A memorandum of August 12, 1993, addressed to the Department of Health officials reporting the most recent findings of the audits performed at seven prisons by the monitor's medical consultants, the report was very critical of the very little progress achieved toward compliance with the Medical Plan. Office of the Court Monitor, *Summary of the Morales Feliciano Litigation,* January 11, 1995 (Dkt.5532), at 193–94.[3]

16. A June 8, 1993 Stipulation on the Río Piedras Complex and Other Matters at 12 (Dkt.4477) described health care at the State Penitentiary as "fragmented, disjointed, thus lacking continuity of care."

17. A similar pattern of noncompliance with the Mental Health Plan was documented in a series of reports including, the *Report of the Court Monitor—Report Pursuant to the Court's Order of January 4, 1990* (filed March 16, 1990; confirmed June 13, 1990; Dkt. 2123) (finding acute mental health care at Annex 504 and Vega Alta grossly deficient); *151st Report of the Court Monitor—Report on Delivery of Mental Health Services at Vega Alta* at 2 and § II (filed April 25, 1991; confirmed May 21, 1991; Dkt. 2822) (documenting dangerous conditions under which psychotic female inmates had been held, and defendants' failure to remedy problem); *134th Report of the Court Monitor—*

---

**3.** Despite these discouraging findings, the National Commission on Correctional Health Care in 1992 had accredited the medical care programs at four prisons and provisionally accredited four more, with several additional prisons under consideration for accreditation. However, one of the monitor's consultants, Dr. Ronald Shansky, found noncompliance with at least one essential standard at every institution the Commission had accredited. During this investigation, Department of Health personnel provided the monitor's staff with credible evidence that other employees had falsified documents in sup-

port of accreditation. Plaintiffs' Exhibit 607, Stipulation Findings of Fact by the Court Monitor Regarding Actions Taken in Advance of NCCHC Accreditation Inspections (June 14, 1993), approved by Order of June 29, 1993, Dkt. 4504. The Executive Director of Correctional Health then withdrew the request for accreditation for all Administration of Correction ("AOC") institutions, including those previously accredited. Office of the Court Monitor, *Summary of Morales Feliciano Litigation* (January 11, 1995), Dkt. 5532, at 194–95.

*Report on the Delivery of Health Care Services at Guerrero* (filed December 7, 1990; confirmed February 4, 1991; Dkt. 2545) (documenting failure to operate special treatment unit in compliance with Mental Health Plan and inadequate, sometimes inappropriate and dangerous, treatment); *168th Report of the Court Monitor—Report on Observations of Mentally Ill Inmates Housed in the Intensive Treatment Unit of the State Penitentiary* (filed August 23, 1991; confirmed October 30, 1991; Dkt. 3139) (finding failure to screen inmates in Intensive Treatment Unit consistently with mental health plan and noting breakdowns of communication between AOC and the Department of Health ("DOH") that adversely affected provision of care); *215th Report of the Court Monitor—Report on Defendants' Progress Toward Compliance with Their Mental Health Plan* (filed September 23, 1992; confirmed October 19, 1992; Dkt. 3969) (reporting comprehensive audit finding little progress toward compliance with Mental Health Plan).

## II. NEEDS OF THE INMATE POPULATION: HEALTH CONDITIONS

18. The inmate population in Puerto Rico has a disproportionate need for health services, which translates to a similar need for resources-including time, money, equipment, and facilities—to address those health needs. Particularly there is an urgent need for careful planning based on rational budgeting, streamlined procedures, job security and reasonable compensation, adequate staffing (both health care and security personnel), transportation, quick and responsible contracting and acquisitions, and everything else that is needed to set up an organized health care system that provides services to human beings, albeit not the most fortunate human beings. The Commonwealth's Secretary of the Treasury, who testified on behalf of the equitable defendants, and particularly on behalf of the Governor, repeatedly stated "That is unacceptable" when confronted with the obstacles placed in the way of the Correctional Health Program. No explanation was offered for the consistent policies and decisions by highly placed officials which have brought about the present debacle.

19. In general terms, a high percentage of the AOC inmate population has suffered from childhood neglect or abandonment, abuse, or drug abuse, and/or have previously been in juvenile institutions. Even though the average age of population is in the mid-thirties, there are a disproportionate number of chronic conditions.

20. The prison population in Puerto Rico suffers from a higher overall prevalence of chronic diseases than the general population. The prevalence in the prison population is 20.7 per 100 persons, while the rate in the general population is 12.75 per 100 males. The rate of mental health disorders in the prison population is approximately 30 percent, which is higher than the rate in the general population. The target population in terms of oral health in the prisons is 100 percent. The inmate population is at higher risk for infectious diseases than the general population, and a higher concentration of high-risk illnesses than the free community. The control of infectious diseases is more difficult in the inmate population, first, because inmates tend to be a higher risk population, and second, because of the close confinement of the population. Outbreaks of contagious diseases can more easily become uncontrollable. Based on an outreach performed by mental health staff in 1997, there are an estimated 674 inmates in the Puerto Rico prison system who require mental health care services but who are not receiving such services; of these, approximately 121 should be in an intermediate psychiatric care facility, 464 in ambulatory services, and 89 in the hospital. Approximately 70 percent of the total inmate population in Puerto Rico has a history of drug abuse. This population is a target for mental health services.

21. Approximately 1.4 percent of the total inmate population in Puerto Rico requires acute mental health care. "Acute" mental health care is that care provided to patients who are psychologically decompensated and can involve acute psychosis, severe depression with suicidal ideations, or drug or alcohol withdrawal. (Acute mental health care is provided in a hospital setting or infirmary for those with drug withdrawal symptoms.)

22. Approximately 1.9 percent of the total inmate population in Puerto Rico requires intermediate mental health care. "Intermediate" mental health care is care provided within a psychosocial residential facility. It is care provided to patients with chronic mental health problems who may need constant care at different levels. Within intermediate mental health units, patients are taught daily living skills, use of medication, and how to detect the onset of acute symptoms. Patients in intermediate facilities also are provided occupational and group therapy.

23. Approximately 27.2 percent of the total inmate population in Puerto Rico requires ambulatory mental health care. Ambulatory mental health services are outpatient services provided in the same setting and integrated with regular out-patient services.

24. Currently in the AOC system, the CHP has identified 131 patients with hepatitis A, 356 patients with HIV, 279 PPD+ patients, 147 patients with AIDS, 198 patients with diabetes, 6 patients with active tuberculosis, 311 patients with high blood pressure, 106 patients with epilepsy, 4 with lupus, 46 with peptic ulcer disease, 4 with leukemia, 4 with chronic obstructive pulmonary disease, and 1 cancer patient. There also are 922 patients with chronic conditions in the privatized institutions.

25. One of the objectives of the Plans is the creation of an integrated health care system. An integrated system for the delivery of health care is necessary because it has a multiplying effect on the delivery of services. In an integrated system, services are delivered through interdisciplinary teams. An integrated system of health care delivery represents the standard of care in the community and comports with professional standards of care. An integrated system maximizes the benefits that patients receive from the services rendered by the CHP. It is more cost effective, allows patients to receive different levels of care, and is sounder from an administrative perspective. In an integrated system, all prisoners have available to them the same medical services. The CHP cannot achieve acceptable professional standards of care if any one component of an integrated health care systems is not present. As part of an integrated system of medical care, all of the different specialties—medical, mental, and dental care—must work together. If an integrated system of health services is available when an inmate enters the prison system, all health needs that the inmate may have can be identified, and all such needs can be addressed.

26. An integrated health system includes a system for health education. Health education is necessary to the prevention and promotion of health. Inmates with specific medical conditions require education concerning medication, attending appointments, how to determine when medical attention is required, etc. Health education also is important to enable people within the correctional setting to lower their risk of exposure to disease within the institutions.

27. In certain cases, it is necessary to provide unitary dosages of medication to inmates. Unitary dosage of medication is the individual presentation of each dose of medication to a patient, to ensure that the patient is taking the medication properly. Several types of medications call for unitary doses. For example, the medications used for HIV+ and AIDS patients, for patients with a positive tuberculin test, or active tuberculosis, for patients with mental conditions who must receive psychopharmacological medication, patients who exhibit some kind of physical condition requiring controlled medication, and for epileptic patients. Unitary doses are served by nurses at various times during the day and are taken by the patient in front of the nurse and the custodial officer that accompanies the nurse.

28. Current standards call for placing inmates going through withdrawal symptoms under medical supervision for at least seven days. Failure to provide the necessary treatment can result in dehydration. In addition, withdrawal patients suffer from restlessness and changes in personality. They can be vulnerable and subject to mistreatment or sexual abuse by the general population. Withdrawal from alcoholic intoxication can be a life threatening process.

29. To conduct an effective infection control program, the CHP requires protective

isolation and respiratory isolation facilities to control outbreaks of diseases such as tuberculosis. These facilities are also required by OSHA regulations. Isolation rooms should be checked at least every month, and air changes in the rooms should be monitored. Failure of the isolation rooms to work correctly increases the probability of an outbreak of disease among inmates and staff. Infection control nurses should inspect the isolation rooms at least monthly.

30. An integrated health care system requires the maintenance of medical records, which should accompany inmates who are transferred from one institution to another. Current professional standards also require the maintenance of valid statistics concerning the incidence and prevalence of infectious diseases.[4]

## III. POLICY AS AN INSTRUMENT OF CONSTITUTIONAL VIOLATIONS

### Budgeting Insufficiencies and Instability

31. Since 1993 the Correctional Health Program has never has been provided with a budget sufficient to provide adequate health care services to inmates. In addition, money has been promised to the Program by the Office of Management and Budget, but never delivered, and the Program has not been able at times, to use even available funds. The Health Services and Facilities Administration (AFASS, the Spanish acronym) has on occasions arbitrarily deducted money from the appropriation assigned for the Program, which cannot submit a budget request directly to the Puerto Rico legislature nor to the Office of Management and Budget. The CHP must, instead, submit a proposed budget request to AFASS. From there on, the Program has no control over what happens to its budget request. Nevertheless, by the time the request reaches the legislature, it has been dramatically slashed. Correctional Health Program personnel are not allowed to be involved in developing the CHP's portion of the Executive Branch's budget, beyond submitting the initial proposal to AFASS.

32. A stable budget is critical for the Program because the administration and management of resources cannot be planned unless the program administrators know how much their budget will be. The budgeting process under which the CHP operates does not provide any certainty to the program's administrators. Even after funds have been appropriated to the program, the staff is never really sure how much money will be available for the program's operations. Resolving these issues throughout the year diverts attention and efforts from the primary responsibilities of the program.[5] In spite of increasing expenses over the last four fiscal years, and increasing budget petitions, the funds appropriated for the CHP for the 94–95, 95–96, and 96–97 fiscal years did not change significantly.

33. The Puerto Rico Correctional system is not capable of achieving compliance with the medical and mental health care plans under the present administrative arrangements. The inadequate resources allocated to the CHP result in staffing and supply problems. The present financial arrangements for the Program are not sufficient to achieve compliance with the medical care plan. At present, the process for obtaining professional staff to work in the program is insufficient to comply with the medical and mental health care plans. The physical facilities in many of the institutions are inadequate to achieve compliance with both plans.

34. In preparing a budget request for the CHP, institutional staff present their needs to the program's central office and based on these and the central office's own needs, a budget petition for the program is prepared by the central office staff. The program sends the budget petition to the executive director of AFASS, and has no further participation in the budget process. The process of preparing the CHP budget petition

---

4. "Prevalence" of a disease is the number of patients that have the disease during a given period of time. "Incidence" of a disease denotes the number of patients who become infected with a disease during a given period of time.

5. Exhibits 331 through 390 highlight the difficulties experienced by the CHP in attempting to obtain an adequate budget over the past four years.

begins in September of the prior year, and the Governor's budget petition is presented to the legislature in February or March. The appropriations are made by June 30th and arrive at the program during the first or second week of July of the new fiscal year.

35. The Chief Health Care Coordinator was not involved in preparing the budget for the 1992–1993 or the 1993–1994 fiscal years, because those budgets already had been prepared by the time of her appointment. The budget appropriation for the CHP, including the Correctional Psychiatric Hospital, during the 1993–1994 fiscal year was approximately $18.4 million. Late in 1993, however, the program was notified that $1 million would be subtracted from the appropriation, and later was notified that an additional $1 million would be subtracted from the appropriation. No explanation was forthcoming for either subtraction. Exhibit 613. *See also* Exhibits 331–334. After the CHCC sought assistance from the Secretary of State, then the Governor's Personal Representative anent this litigation, the $2 million was restored to the program, along with an additional $686,505.00. In spite of the additional $686,-505.00 provided the CHP in the 1993–1994 fiscal year, the program had a budget shortfall of nearly $2 million for that year.

36. For the 1994–1995 fiscal year, the CHP submitted a budget petition of approximately $27.5 million, but was appropriated only $22.6 million for operational expenses. The program also had requested approximately $9.5 million for the Correctional Psychiatric Hospital, but was appropriated only $8.4 million. The total amount appropriated to the CHP, therefore, was $31 million. During the 1994–1995 fiscal year, the government withheld 4 percent of the total funding for government agencies to pay incentive bonuses to government employees. In addition, 2 percent of funds appropriated for government agencies was withheld as a contingency fund. This policy affected the CHP as well as all government agencies, but no amounts were withheld from the appropriation for the Correctional Psychiatric Hospi-

tal. As a result of the 4 percent incentive pay withholding and the 2 percent withholding for contingencies, the resulting amount available for planning to the CHP, including the Correctional Psychiatric Hospital, during the 1994–1995 fiscal year was $29.785 million.

37. After the Chief Health Care Coordinator requested assistance from the Secretary of State in late 1994, $2.2 million of the amount appropriated for the Correctional Psychiatric Hospital was transferred to the CHP for its operations. The Secretary of Health promised to cover any further deficiencies that might occur in the program's budget for that fiscal year. In addition to the $2.2 million transfer from the Correctional Psychiatric Hospital, the CHP was restored the 6 percent withheld for merit bonuses and contingencies, although the restoration of these funds did not occur until three weeks before the end of the fiscal year in which they were appropriated. The total funding available for the program in the 1994–1995 fiscal year, therefore, was $24,826,064. The Chief Health Care Coordinator managed to obtain the transfer of funds from the Correctional Psychiatric Hospital and the restoration of funds from the contingency and merit bonus funds after plaintiffs filed a motion for a preliminary injunction to compel defendants to adequately fund the CHP.[6]

38. Expenditures by the CHP in fiscal year 1994–1995, however, were approximately $31 million, leaving the program with a deficit of approximately $6.3 million. It cannot be determined how the $6.3 million deficit was covered, because the responsibility for covering costs and expenditures of the program falls upon AFASS.

39. For the 1995–1996 fiscal year, the CHP submitted a budget request for approximately $64.6 million. This amount includes $15.2 million for the Correctional Psychiatric Hospital, $38.4 million for the CHP's operations, and $11 million for the medical surgical unit. The medical surgical unit was to be a secure unit for tertiary care for inmates, to minimize reliance on outside facilities: this

6. Funds appropriated for the operation of the Correctional Psychiatric Hospital could be used for other purposes because the construction and delivery of the Hospital were inordinately delayed.

component of the health care system also has not been developed. The amount appropriated for the CHP for the 1995–1996 fiscal year was approximately $34.2 million; which is just under 50 percent of what was requested. The $34.2 million included $2 million appropriated for the Correctional Psychiatric Hospital, and $32.2 million for CHP operations. Although the Correctional Psychiatric Hospital could not be opened during the 1995–1996 fiscal year, the CHP already had hired staff for the hospital based on the promises made to her that the Hospital was nearing completion.

40. At a meeting in June 1995, the Secretary of Health agreed to make available $48.3 million to the CHP. These funds would consist of the full $38 million requested for CHP operations and approximately $10 million for the Correctional Psychiatric Hospital. In spite of the Secretary of Health's promises at the June 1995 meeting, only $40 million was assigned to the CHP consisting of the original $32 million appropriated, plus an additional $8.4 million. The additional $8.4 million assigned to the CHP disappeared from AFASS' information system in June 1996 because the Office of Management and Budget had decided not to make the monies available through AFASS' accounting system. Instead, the program would be allowed to spend up to $5 million and any excess would be covered by AFASS from its own budget. The CHP spent $40 million in fiscal year 1995–1996, leaving a deficit of $7.8 million. This is typical of the unstable budgeting practices which make rational, efficient and cost effective management impossible as a direct result of the defendants' policy acts and omissions.

41. For fiscal year 1996–1997, the CHP requested a budget of $75.5 million, including $50.8 million for the program's operations, $12.8 million for the Correctional Psychiatric Hospital, and $11.8 million for the Medical Surgical Unit. The total amount appropriated to the CHP for fiscal year 1996–1997 was $31 million for the program's operations. This amount also was supposed to include the

Correctional Psychiatric Hospital. In addition to the $31 million appropriated to the CHP's operational budget, two special assignments totaling $900,000 were made to the Program. Although no funds had been specifically appropriated to the CHP for the Correctional Psychiatric Hospital for fiscal year 1996–1997, in May 1996 the Governor signed an executive order awarding $2 million for opening the Correctional Psychiatric Hospital, which was accomplished in August 1996.

42. Given the anticipated shortfall in funding for the CHP in fiscal year 1996–1997, in July 1996 the Director of the Office of Management and Budget agreed to award an additional $20 million to the program. In spite of the promise by the OMB Director, the $20 million never was made available to AFASS for CHP's budget.[7] In May 1997 the Governor signed an executive order transferring $20 million from the Budgetary Fund for use by the CHP. These funds were placed within the Department of the Treasury. The Governor's executive order of May 1997 did not actually provide the CHP with an additional $20 million, but merely reinstated the $20 million that the Director of the OMB had promised the program the previous year.

43. At the time of the hearing it was still not known how much the CHP spent in fiscal year 1996–1997 (which had ended on June 30) because AFASS ceased making payments to contractors and suppliers and the program's expenses are currently are being paid for from the $20 million in the control of the Department of the Treasury. The process of determining how much money is owed by the program still hasn't been completed. Of the $20 million placed in the control of the Treasury Department, approximately $8 million were used to pay debts of the CHP for the 1996–1997 fiscal year and debts outstanding from prior fiscal years. Another $8 million was spent in the program's regular operations.

44. The Program was assigned $46.06 million for its 1997–1998 budget. The CHP anticipated that it would have a budget short-

---

**7.** Repeatedly, funds promised by the OMB either have never been transferred or a lesser amount than promised has been transferred to AFASS.

*See* Exhibits 373, 375, 377, 380, 381, 383, 385, 386.

fall of approximately $6 million for the 1997–1998 fiscal year. Based on the anticipated 1997–1998 shortfall, the CHP prepared four analyses of its budget in an attempt to confront and deal with the contemplated shortfall.

45. As an example, one alternative proposed for dealing with the 1997–1998 budget shortfall would be to dismiss 20 regular employees. Furthermore, purchases would be reduced by 32 percent comprising of medical and surgical material; dental material; health education material; physical, occupational and recreational material; office and maintenance supplies; dental prosthesis and eyeglasses. In addition, the program would reduce by 15 percent the purchase of drugs and medicines, it would eliminate the purchase of medical and office equipment, reduce by 18 percent the general expenditures of the program and do away with the reserves of funds created to pay debts from previous years. The implementation of any one of the four alternatives to counterbalance the 1997–1998 budget shortfall would deal a severe blow to the delivery of health care services by CHP.

46. The budgetary difficulties faced by the CHP have not allowed the program to use its budget and fiscal processes as administrative and management instruments because the program has never been able to anticipate how much money it will have available. The program has no control over its budgetary and fiscal situation, much less the autonomy required to comply with the court's orders.

47. Since 1993, the services provided to inmates have increased. This increase necessarily results in higher costs to the CHP. As more inmates are seen by health care professionals, more lab tests are ordered and more illnesses and diseases are diagnosed and treated.

48. The problem of lack of funds which affects the CHP has diverted the attention of its personnel from other administrative aspects of the program. The time spent addressing the funding problems has reduced the time available to attend to personnel and internal administrative matters. The CHP's staff does not know how, when or whether budget deficits are covered since this is an internal matter within AFASS's control.

49. Because of funding shortages, the CHP can only obtain special nutritional supplements for the most seriously ill patients. One of the Chief Health Care Coordinator's concerns in initiating a triple therapy program for HIV-positive patients in the AOC system is the lack of monies for medication and personnel. The CHP could have begun to provide triple therapy in 1996 if the concerns about budget, inmate tracking, and continuity of care had been addressed. The cost per patient of triple therapy is between $8,000 and $13,000 per year. Instituting triple therapy, however, can eventually save the Commonwealth money by reducing the number of patients that are hospitalized for opportunistic infections. The shortages and uncertainty in appropriations for the CHP make it difficult to contract with outside vendors since the program has to certify to them that funds are available to cover the expenses generated by any such contract. In addition, the program could not fill thirty staff positions needed to handle the administrative responsibilities associated with the execution of such contracts.

50. Administrative Order 112, together with Administrative Order 66, were intended to provide the CHP with greater autonomy in contracting and budgeting. Exhibit 379. Order 112 was intended to allow the CHP to transfer funds between line items in its budget. Administrative Order 112, however, did not fulfill the purposes for which it was promulgated because the Correctional Health staff were not given contract numbers.[8] The CHP also could not exercise the budgetary autonomy intended by Administrative Order 112 because the program's staff did not have access to the Department of Health computers to transfer funds from one line to another. Thus, even when monies were available

---

8. Public contracts, once approved, must be numbered. All agencies have a set of numbers for contracts to track them in the system. In effect, the lack of a contract number renders the contract.

in the program's budget, the program may not be able to use them.[9]

51. The dissolution of the Anti–Addiction Services Department (DSCA, the Spanish acronym) and the creation of the Administration of Mental Health and Anti–Addiction services (ASSMCA, the Spanish acronym) created problems for the CHP because some former DSCA personnel were assigned to the CHP's mental health services program. Even so, the program was not assigned the additional financial resources to pay the salaries of those added persons or to provide anti-addiction services to inmates. Administrative Order 69, which transferred to the CHP the responsibility for providing services formerly provided by DSCA, established that all financial resources, personnel and equipment were to be transferred to the CHP. Although Administrative Order 69 required the CHP to provide mental health services for inmates with addictive disorders, the program was not assigned any budget for providing those services. In spite of the fact that both personnel and responsibility for anti-addiction services supposedly were transferred from DSCA to the CHP, the program never received the budgetary funds to correspond to the transfers. The only items actually transferred to the CHP from DSCA were some vehicles in very poor condition and some equipment.

**Deficiencies in Staffing**

52. The Correctional Health Program never has been able to recruit the number of health care staff required to provide adequate health care services to the AOC inmates. In particular, the number of staff personnel required to provide mental health services has never been enough. In some intake centers, where medical personnel are supposed to cover the admissions area 24 hours per day, CHP can only provide staff during the day and evening hours.

53. The Program does not have adequate control over its personnel administration. This lack of control has led directly to deficiencies in the delivery of health care services, and, in at least one instance, caused the death of an inmate. Arbitrary and unreasonable limitations on the program's ability to recruit personnel have been imposed on the program by the Secretary of Health and the Director of the Office of Management and Budget (OMB). For example, after the government privatized the Commonwealth's public health system, the Secretary of Health and the Director of the OMB instructed the CHP that it must first recruit new personnel from individuals formerly employed by the (Department of Health) DOH. It took several months for AFASS to deliver to the CHP a list of candidates who had been ceased from their employment with DOH as a result of the health reform. Even then, most of the candidates had no interest in working for the CHP.

54. Personnel in the CHP are grouped into four categories: employees who hold regular or permanent positions, transitory employees, wage earning employees—also called irregular employees—and contract employees. The law that created AFASS permits the recruitment of health professionals by contracts to provide medical services to the patients. Of the four categories of personnel in the DOH, the irregular and contract categories are the least attractive to prospective staff because they do not include fringe benefits.[10]

55. Employees in the irregular category were recruited by the clinical services director at each institution and, once recruited, were officially appointed by the program's central office personnel division. As to the employees to be hired under contracts, the Chief Health Care Coordinator approved the recruitment of such employees subject to availability of funds. Once the potential employee is recruited, however, the award of a contract requires the processing of a number of documents. The contract processing procedure was originally performed by AFASS. Subsequently, the authority to process these contracts was transferred to the CHP al-

---

**9.** Another blow to the Program's stability was the transfer of anti addiction functions to the CHP which thus acquired greater obligations without the wherewithal to deliver the services.

**10.** Staff classified as "irregular" can, however, begin to accrue sick leave and annual leave after three months of employment, but they do not get medical insurance coverage.

though such contracts were still subject to AFASS' approval. Some of the documents that had to be compiled included a negative certification of debt from the Municipal Revenue Collection Center (CRIM, the Spanish acronym), the Department of the Treasury, and the Administration for Child Support Enforcement (ASUME, the Spanish acronym). This process could take months to complete. After the Court issued an order (at the joint request of plaintiffs and defendants) allowing the Chief Health Care Coordinator to process contracts, the process is presently completed in just a few days.

56. During the time that it takes to process a contract for professional services, the professional is not paid, even though he or she was performing services for the CHP. The CHP would compensate the professional by means of a "debt resolution." Under a debt resolution system, the actual payment is made after a contract is approved. The executive director of AFASS can approve a debt resolution up to a certain amount but beyond that amount, it must be approved by the Secretary of Health. Currently, however, the executive director of AFASS is the Secretary of Health. Typically, in agencies other than the DOH, a debt resolution is used to pay for services rendered on a one-time basis, where there is no contract. If a contract is being processed, then the agency does not issue debt resolutions. Initially, payment by debt resolution was made during the time that contracts were pending at AFASS, but later, the process was changed so that debt resolutions were issued only after the contract was approved. The Secretary of Health, however, has tried to limit the use of debt resolutions. In effect, this leaves the CHP in a difficult situation because it cannot offer contract employees immediate pay while contracts are pending, but it cannot offer them debt resolutions either. *See* Exhibits 179–198, 227–237. In July 1995, AFASS notified the CHP that it no longer would pay contract professionals whose contracts were pending renewal until after the contract was renewed. Under this arrangement professionals had to work for extended periods of time without being paid. Exhibits 228, 229.

57. Prior to August 1996, doctors on duty were paid $18 per hour, and it was extremely difficult to get anyone to work for that money. Beginning approximately in August 1996, doctors on duty were paid $22 an hour from Monday to Friday night and $25 an hour on weekends and holidays. This modest raise has not resolved the problems of recruiting doctors to work at night and on weekends because at medical facilities covered by the health reform, night and weekend shifts are paid $30 to $35 an hour. In June of 1996 and June of 1997, many professionals under contract positions resigned because the money they were paid was too low and because the facilities were grossly inadequate.

58. The CHP cannot pay per diem and mileage to the doctors on duty. In 1996 the CHP paid mileage to the personnel under contract but was not authorized to pay per diem.

59. The large number of transitory employees and regular positions in the CHP has resulted in instability within the work place. The transitory positions offer some measure of stability, but those positions tend to be extended after expiration of the initial term on a month-to-month basis, offering the employees little assurance that their positions will remain available in the long term.

60. The CHP can offer no incentives for the economic betterment of its personnel. The CHP cannot provide any economic incentives to reward good work or merit. Contract personnel in the CHP have no fringe benefits except for mileage. The bureaucratic and budgetary obstacles to recruiting and retaining qualified personnel result in a loss of motivation among the personnel. Correctional Health professional staff complain that the personnel system is too complicated and bureaucratic. The budgetary and bureaucratic obstacles to recruiting and retaining professional staff negatively affect the ability of the administrators of the CHP to monitor the quality of services delivered to the penal population. The CHP cannot recruit the necessary staff it needs to operate efficiently because the difference in the budget appropriated to the program in relation to the actu-

al payroll expenses of the program in previous years is inadequate.

61. The number of regular employees increased between March 1996 and June 1997 as a result of a law passed in 1996 that granted regular status in permanent positions to certain transitory employees. Exhibit 543. The CHP experienced substantial instability in staffing levels during the period from April 1995 through June 1997. Exhibit 590. The CHP experienced a substantial decrease in recruitment, and a consequential decrease in staffing levels, in June 1996 after the adoption of Law 150. This law established a two-year waiting period before a person who had worked for the government could be re-hired into government service. Furthermore, the Program's recruitment efforts declined in September, October, November, and December 1996 because of the electoral law's prohibition on hiring personnel for sixty days before and after a general election. Exhibits 590, 545.[11] A precipitous decline in recruitment was experienced by the CHP in June 1995 because a hiring freeze was implemented at the Department of Health. Exhibits 590, 545. The CHP experienced a decline in the number of registered nurses employed by the program in May and June of 1996. The program recovered from the decline following July 1996 after the promulgation of Administrative Order 112, but experienced another decline after February 1997 because the prohibition on hiring imposed by the electoral law in the months following the 1996 election ended and nurses started seeking employment with other governmental agencies. Exhibits 547, 595, 596. The experience of the CHP in recruiting and retaining registered nurses during 1995, 1996, and 1997 was very disheartening.

62. In August 1997, the CHP could not hire nurses for Camp La Pica because of budgetary shortfalls. The shortage of nurses at La Pica had to be covered by transferring nurses from the Ponce correctional facilities. It became very difficult at times to effectuate said transfer due to the resistance and protests of the nurses selected to be transferred to La Pica.

63. The CHP is not complying with the Medical and Mental Health Plans in part due to the difficulties it faces hiring and retaining personnel. Said difficulties are caused by factors foreign to the functioning of the Program.

64. A serious setback in the ability of the CHP to recruit qualified professional personnel occurred in 1995 when the Government Ethics Law was amended to mandate a two-year prohibition or waiting period before awarding employment contracts to persons who formerly held civil service positions with the government. This amendment, knows as Law 150, created problems for the CHP because one of the sources available to it for recruitment of health professionals comprised those individuals who had just completed a mandatory one-year public service requirement. These persons were considered "civil servants" under the statute, and thus were subject to the two-year waiting period. It was possible depending on the circumstances to obtain a waiver from said prohibition. The waiver had to be obtained from either the Government Ethics Office or the Central Office of Personnel Administration (OCAP, the Spanish acronym). The delays confronted in obtaining a waiver, in most cases, was too costly to significantly improve recruitment.

65. Unfortunately, OCAP and the Government's Ethics Office (OEG, the Spanish acronym) had conflicting interpretations of Law 150. OCAP was of the opinion that the mandatory year of public service did not fall within Law 150. The OEG not only concluded otherwise, but also insisted that OCAP had not authority to interpret Law 150 in such cases. In addition, the OEG opined that a person who had obtained a waiver from the application of Law 150 was required to apply for a second waiver when that person's contract was renewed, even if there was

---

11. The Court notes that a dispensation can be obtained to hire personnel during the "veda electoral" period (September through December of an electoral year) under emergency conditions or to provide necessary public services. No evidence was presented to show whether or not an application for such a dispensation was made by the Secretary of Health, or why such an application, if made, was denied.

no change in the substantive terms of the original contract. Following the entry of the Court's order of May 16, 1997, the CHP ceased requiring waivers for persons who already had obtained a waiver but whose contracts were up for renewal. The CHP, nevertheless, was not able to recover from the detrimental effects of Law 150 on its recruitment efforts. As a result of the passage of Law 150, the CHP lost 14 professionals because that were not granted waivers. These included general practitioners, psychologists, dentists, occupational therapy assistants, physical education teachers, and medical coordinators.[12] The defendants have not shown that any effort was made to solve these bureaucratic conflicts in spite of the dire consequences which they directly caused to the quality of the health care provided to the members of plaintiffs' class.

66. The CHP attempted to fill positions with independent contractors because the program could not offer salaries to professionals for permanent employment positions that were competitive with private sector opportunities. By offering them contracts instead of permanent employment positions the program was able to offer higher salaries. Although this practice is fairly common throughout the Department of Health since the department's salary scales are too low to attract qualified professionals for employment, the CHP was not very successful in its efforts to recruit personnel.

67. The CHP began to develop a personnel office in 1994. The creation of a personnel office within the CHP was authorized by Administrative Order No. 66 of June 3, 1993, which also allowed the program to appoint employees and to contract for professional services. The CHP began to recruit personnel in April 1994 until July 1994, at which time it had to suspend recruitment because of a June 1994 moratorium on hiring at the Department of Health. The moratorium on hiring declared in June 1994 continues in effect as to permanent positions and irregu-

lar positions, but the CHP has managed to hire professionals as independent contractors. The program also had to seek the intervention of the Governor's Personal Representative to cover positions at the Ponce Complex when that complex became an intake center. Even though the program obtained the requested assistance, there was considerable delay in staffing the intake center.

68. A second Administrative Order, Number 112, issued in July 1996, delegated further authority to the CHP in making hiring decisions. The program's ability to make use of the authority granted by Administrative Orders 66 and 112 has been curtailed by a number of hiring moratoria. The Secretary of Health insisted that all irregular appointments required the approval of the deputy director of AFASS. This requisite meant that the delegation under Administrative Order 66 had little effect. Nevertheless, the CHP experienced a substantial increase in staffing levels during the months following July 1996, when Administrative Order 112 delegated to the program's newly created personnel office the authority to create transitory positions.

69. Although the June 1994 moratorium continued in effect, it was conditionally lifted in October 1994 to allow the program to fill regular positions, provided that such positions were first to be offered to qualified DOH employees who had been displaced by the privatization of health services and by persons referred to CHP by the Right to Employment Administration. If no personnel was available from these two sources, then the CHP was permitted to recruit from outside the DOH. Only if the Deputy Secretary of Health issued a written certification that there were no candidates available under the health reform, could the program recruit from other sources. The requirement that the CHP recruit from among DOH employees displaced by the health reform led to a number of problems. For example, the

---

12. The 14 persons lost by the CHP in 1996 because of Law 150 had not been granted waivers because OCAP determined that the professional services they provided the CHP were the same as those for which permanent employment positions were defined by Puerto Rico's personnel laws. Nevertheless, few positions were available in the CHP for those persons;. For those few permanent positions that did exist, the compensation package established by the DOH could not compete with the compensation available in the private sector.

Secretary of Health transferred a number of displaced DOH employees to the CHP without first notifying the CHP's central office. In addition, the Executive Director of the CHP made a number of attempts to obtain a list of available personnel displaced by the health reform, but the list was not provided until late 1994, several months after the directive was issued. Until then the CHP continued recruiting personnel from the other sources up to December 1994. It was then that the Secretary of Health announced that all irregular appointments had to be submitted for approval to the deputy director of AFASS. The CHP made numerous efforts to recruit DOH personnel displaced by the health reform from 1994 through 1997, but many of the candidates that were available did not want to work in the prisons. A large number of them did not even show up for interviews with the institutional medical directors.

70. The CHP has been losing ground steadily since 1996 in recruiting and retaining personnel. During 1997, the program lost the executive director, its director of mental health services, the director of the psychology section, the pharmacy director, and the director of the control of infectious diseases (who was replaced in July 1997). In 1996 the program lost its engineer, its director of quality improvement, its director of dental services, and previously in 1995, the program lost its personnel director. With the exception of the director of the area of infectious disease control, the program has not been able to replace any of the other directors it has lost. The program suffers from a high rate of turnover, which currently stands at the rate of 50% throughout the system. This high rate of turnover affects proportionately, in negative way, the continuity of care provided to patients in the institutions. The conditions at the physical facilities of the AOC institutions have made it difficult to recruit personnel. Another difficulty when recruiting personnel is the fear that prospective recruits have to work in a prison setting. At times, the CHP has had to stop recruitment because of budgetary difficulties. At other times, the program has had the budget, but there were no candidates available. Still at other times the budget has been available and candidates have been recruited, but because of some bureaucratic impediment, they were not hired.

71. It is impossible to cover every aspect of health care delivery when the program suffers from shortages of key personnel. The shortage of CHP staff at the institutional level has severe consequences on the ability to provide health care to inmates. For example, the effect of the amendment to the Government Ethics Law (Law 150) meant that admission services were curtailed or eliminated at some institutions, resulting in numerous inmates with undetected health conditions entering the prison system.

72. Other factors which impact on staff retention are the frustration that the personnel feel when they are not able to move the Program towards greater compliance with the court's orders; the difficulty in replacing lost personnel because it cannot compete with the private sector in terms of salary and benefits; the crowded and inadequate facilities where the health services are provided; and the lack of adequate equipment.

73. It may take six to eight months to fully train CHP staff before they become familiarized with the institutions and the Program's policies. Each time the Program loses personnel this represents a loss of a significant investment in time and resources even if the person leaving is immediately replaced.

74. The dedication and quality of the CHP personnel are simply not enough of a driving force to continue to improve the correctional health services offered. People can burn out, which in turn, causes the fragile system that is in place to collapse.

75. The CHP also lacks the necessary staff to cover the infectious disease program at the central level. In particular, the program lacks a statistician. The absence of staff in this area means that certain duties that need to be performed by specially trained staff are carried by other health care staff.

76. One specific area of great concern to the court is the decline in the mental health staffing levels. It is very difficult to find

mental health providers who want to work in a correctional environment. The problem exists at both the retention and recruiting stages. The requisite staffing levels for the mental health care component of the CHP were established as a result of a mental health staffing plan that was developed after the Mental Health Plan was adopted. Since that time the demand for mental health staff has increased in the AOC, in part, because of an increase in the inmate population, and also because of an increase in the number of acute psychiatric cases being admitted from the free community.[13] Statistics for the program show that after a marked improvement in staffing in the types of mental health provided between 1993 and 1996, these fell overall during the 1996–1997 fiscal year. The reasons encountered in recruiting personnel to provide mental health services are two-fold: first, most mental health professionals gravitate to the San Juan area, thereby reducing the number of potential candidates for facilities outside of the metropolitan area; second, the CHP cannot compete with the private sector, with ASSMCA, or with the health reform, since the program cannot offer competitive salaries or fringe benefits.

77. The program has taken steps to expand the amount of coverage provided with the short numbers of staff it has, but even so, not all areas are covered. For example, to cover the shortage of psychologists providing admission services, CHP personnel are in the admissions areas from 8:00 a.m. to 11:00 p.m. The Mental Health Plan requires that admission areas be staffed 24 hours per day. Similar measures are taken anent emergency areas. The shortage of personnel at the Sabana Hoyos Correctional Institution for approximately three months prior to September 1997 was so acute that the CHP was not able to provide full-time admissions or emergency areas coverage.

78. The CHP cannot provide on-call physicians to cover emergency services at smaller institutions. The Comptroller of Puerto Rico has concluded that it is illegal to pay on-call physicians that are not on-site during the time that they are on-call. Nevertheless, using on-call physicians to cover emergency needs is standard medical procedure. (This is the single instance of a stumbling block that the court can find that does not originate with the defendants. The Comptroller is an autonomous entity. The defendants, however, did nothing to challenge the Comptroller's ruling.)

79. The CHP has only 50 percent of the dentists it needs. It is difficult to recruit dentists because the Commonwealth's health reform program includes very generous dental care coverage, which means that dentists can make substantially more money in the private sector than at the CHP. As explained elsewhere in these findings, dentists (as well as other CHP personnel) also are difficult to recruit because of inadequate facilities, supplies and equipment.

80. In spite of significant improvements in health education, the CHP still does not have a sufficient number of health educators to train correctional officers and for in-service training of health personnel. The program requires six or seven more health educators.

### Personnel Problems at the Three Main Correctional Complexes [14]

81. The CHP is plagued by a high turnover of physicians and shortages of staff at the institutional level. The admissions area at the State Penitentiary complex in Río Piedras suffers from a lack of physicians.

---

13. The Puerto Rico prison system has been receiving acutely psychotic patients from the street over the past few years. From July 1996 to June 1997, 423 acute psychiatric patients with incarceration orders were admitted to the Río Piedras State Penitentiary. This number represents an increase over prior years. This is also a general problem affecting all intake centers in the AOC system. Admission of these inmates cannot be refused by the AOC because they are committed by Commonwealth courts. When acutely psychotic patients are admitted to an AOC institution, they must be placed in emergency care facilities.

14. The three main correctional complexes at Río Piedras, Bayamón and Ponce hold approximately 60% of the AOC's population and must process by far the largest number of admissions to the system: Sabana Hoyos (which is a health care disaster) is smaller and Vega Alta is an intake facility only for women who represent only a small percentage of the total population.

On many occasions there are no physicians on duty during the night hours. The constant resignation of the doctors ascribed to the admissions area of the Río Piedras complex detrimentally affects the completion of the inmates' intake health evaluations. In 1995, the completion of intake evaluations within seven days of admission was 30.6%; by 1996, this rate had increased to 90%. After May 1996, however, the rate dropped to around 50%. The recruitment of physicians for the Río Piedras complex is very difficult. Employment under contract is not attractive to physicians because there are no fringe benefits available. Until recently, physicians who had just completed the required year of public service were ineligible to work for CHP by contract because of recent amendments to government ethics statutes. Another factor that affects negatively the recruitment of physicians is the risk factor of working within a prison setting. The program cannot offer sufficient incentives to compete with the private sector in the recruitment of psychiatrists at the Río Piedras complex.

82. Admission services available at night and during the weekends at the Ponce Complex are staffed with physician, nurses, and medical record personnel until 11:00 p.m., although admission services should be staffed 24 hours per day. The recruitment of personnel for night duty is made by professional service contracts. The CHP has encountered problems recruiting personnel for the Ponce Complex because of competition from the private sector and from the health reform. As a result of the health reform carried out in the municipalities near Ponce there exist job opportunities for physicians offering better salaries, working conditions, and personal security than those offered at the Ponce complex. The complex does not have a gynecologist or obstetrician for the women's facility. The chronic care clinic for young adults and the women's facility is staffed with a family medicine practitioner. The lack of physicians for the complex as a whole results in only 2 percent of the population having access to sick call services. At least three or four more physicians are needed, especially in the maximum security area, where two physicians are required to cover

sick call. Currently, only one is available and there have been months when no physicians were available. The dispersion of medical services throughout the complex stretches to its limits the personnel that are available, whereas centralization of these services would result in a more efficient use of available personnel. The complex is short of dentists. The young adults intermediate psychiatric care unit is staffed with a director (who is a social worker) and a psychiatrist during Saturdays. The shortages of personnel affect the delivery of care to the patients and also makes it difficult to retain the personnel, who leave as they become frustrated as a result of said shortages. Only one psychiatrist, who works 120 hours a month, is assigned to cover the ambulatory services plus the admission patient referrals at Ponce Main, young adults, women, and Ponce Maximum. Another psychiatrist, who works 40 hours per month, divides his time between the two intermediate care modules at the complex.

83. The Bayamón facility also suffers from a lack of personnel. The admission process at the Bayamón complex never has been carried out in a continuous fashion because of a lack of physicians to perform the admission examinations. Part of the difficulty in recruiting personnel is the scarcity of X-ray services. Doctors have refused employment at Bayamón because they cannot count on the use of X-rays as a diagnostic tool in completing evaluations. Other factors which contribute to the difficulty of recruiting health personnel at Bayamón is the lack of security and the great number of patients needing medical treatment. One of the tactics used by CHP personnel to cover admission services is assigning off-duty physicians to night duty. Thus, some physicians at the complex in effect work 80–hour weeks. Some of the physicians have threatened to resign because of the stress this places on them.

84. The Río Piedras complex lost one of its two X-ray technicians in October 1995. The remaining technician was not sufficient to cover the demand generated by new admissions. Although a second technician finally was recruited in July 1997, the two that

are presently there are not sufficient to cover all shifts.

## Additional Personnel Insufficiencies

85. The CHP does not have an ophthalmologist.

86. Additional staff will be necessary to properly administer triple therapy treatment for HIV patients. In particular, physicians who specialize in infectious diseases must perform the initial evaluations and the initial follow-ups for such patients in order to design the optimal treatment plan. The infectious disease specialists also should perform periodic supervision of the treatment these patients are receiving.

87. In spite of the difficulties in finding and retaining qualified staff, the persons that the CHP does manage to recruit are highly competent and extremely committed to the process of providing correctional health care services. Those who testified at the hearing however, made it abundantly clear that they cannot hold out much longer under the present circumstances and that some drastic changes must occur. Although the various medical directors testified about their personal experiences, they also stated that many other health care personnel under their supervision felt the same way.

## Employee Discipline

88. By virtue of Administrative Order 66, the CHP's personnel office commenced filing for disciplinary proceedings against CHP staff with AFASS but no action was forthcoming. In early 1995, the director of the personnel office of the CHP visited AFASS to inquire as to the status of the disciplinary cases referred to it and was told that AFASS had too much work and too many disciplinary cases from the Department of Health. It was then that the Chief Health Care Coordinator requested permission from the Secretary of Health to contract a lawyer to process the disciplinary cases. Although authorization was granted, the CHP encountered numerous obstacles anent the attorney's contract. After having rendered services for some time, the contract for the attorney retained by the CHP to process the disciplinary cases was not renewed and another attorney, chosen by the legal division of the Department of Health, but paid for from the Program's budget, was assigned. The attorney selected by the Department of Health's legal division to process disciplinary cases for the CHP was completely unfavorable to the program. In January 1997, the Secretary of Health peremptorily ordered the immediate cessation of legal services for disciplinary matters and ordered the CHP to contact the services of a private law firm.

89. The disciplinary actions processed by the CHP through AFASS involved permanent employees and those transitory employees with an expectation of a contract lasting more than one year. There are several reasons why an efficient employee disciplinary program is important, including deterring employees from infractions of the rules, thus ensuring order in the functioning of the program. The inefficiency in processing disciplinary matters in the CHP threatens these goals. For example, in early 1996, a number of CHP staff participated in an illegal strike at the Río Piedras Complex. Although AFASS was asked to take disciplinary action against these employees, six months later nothing had been done. One CHP employee was the subject of numerous complaints at the Arecibo District Jail in 1996. The Secretary of Health was asked to take some action against the employee, but almost nine months later, the Secretary still had not responded to the request. In early 1995, the Chief Health Care Coordinator requested the assistance of the Secretary of Health in dismissing a problematic CHP employee, but almost two years later the situation remained unresolved.

90. Disciplinary action is ineffective because cases are not energetically and promptly prosecuted. For example, the program currently has 52 disciplinary cases that have been pending between two to three years at different levels in the process of adjudication. It can take months to prepare a disciplinary case for presentation to the Secretary of Health for action. Then, the disciplinary regulations which cover the CHP staff are general regulations developed for AFASS and the DOH and do not take into consideration the particular concerns relevant to a correctional setting such as securi-

ty. Because the disciplinary regulations which apply to CHP staff are not geared to a correctional setting, the program does not have the tools that would facilitate the enforcement of adequate discipline measures in the correctional setting. The absence of a prompt and effective disciplinary system for CHP staff lowers the morale of those that do not violate the regulations. They come to feel that the system has a greater concern for those who do not comply with applicable norms than for those that do.

### Facilities

91. Admission into the Puerto Rico prison system currently is done through the Bayamón, Ponce, and Río Piedras Complexes, and at the Vega Alta and Sabana Hoyos correctional institutions.

92. Among the weaknesses identified during the strategic evaluation performed in 1996 was the inadequacy of the physical facilities available for providing correctional health services. Crowded, unsecure and inadequate physical facilities is one of the factors making it difficult to hire and retain health care personnel. The physical setting in which health care is provided in the AOC system affects the ability of specialists in various disciplines to work together, particularly in the larger institutions, where services are scattered among different buildings. This is especially true in Río Piedras, Bayamón, and Ponce, where the scattering of services makes supervision almost impossible. Insufficient clinical space at the prisons also has made it difficult to provide subspecialty clinics on-site.

93. Acute mental health care for inmates is provided at the Correctional Psychiatric Hospital, which opened in August 1996. Only one of the three modules—which module has 54 beds—is currently in use. The criteria for psychiatric hospitalization is acute decompensation exhibiting psychotic symptomatology, suicidal ideation and severe depression, or drug addiction-related symptomatology with psychiatric decompensation.

94. During an outreach performed by Correctional Health staff in 1997, 17 inmates were identified as requiring hospitalization, yet only 11 of these inmates could be hospitalized for lack of psychiatric hospital beds.

Some of these inmates have been waiting two to three months for a bed in the hospital. Optimally, when a patient is diagnosed as requiring psychiatric hospitalization, the patient should be immediately hospitalized. The Correctional Psychiatric Hospital remains partially open because the AOC cannot provide the 45 correctional officer needed to provide security for the hospital.

95. The CHP also does not have sufficient PICU (psychiatric intensive care unit) beds for the number of patients who require that level of care. The Plans require a total of 25 beds for emergency mental health care in the Puerto Rico prison system. Currently, the system has only 20 beds for emergency mental health care: 14 at Río Piedras, 2 at Ponce, and 4 at Vega Alta. None of the other intake centers have emergency mental health care beds. The PICU at the Río Piedras complex must serve all of the male institutions on the island because the Ponce facility, with only two beds, is not sufficient. Consolidating emergency mental health care services at the Correctional Psychiatric Hospital would allow the CHP to render better services to the inmate population. Because of the unavailability of physical facilities generally for correctional health services, the PICU area also houses the offices of the regional epidemiologist, the health services coordinator for the Río Piedras complex, two health educators, and two other staff persons not directly related with the mental health care services.

96. There is also an acute shortage of medical dormitory beds. There are only 32 medical dormitory beds currently in use; these are located at the Río Piedras State Penitentiary, which means that only pre-trial detainees can be housed there. Ten medical dormitory beds at Annex 504 have been unavailable for a year and a half because of reconstruction work performed under the Facilities Rehabilitation Program. Although there is an area designated as a medical dormitory at the Bayamón Complex, the AOC places inmates in that area that do not require health care services. There used to be 25 beds at Ponce Main designated as a medical dormitory, but the AOC requested use of the beds for non-health care purposes

in 1995. The AOC has never returned those beds to be used for medical purposes only. There is no medical dormitory (or infirmary) at the Sabana Hoyos Correctional institution, nor is there an intermediate psychiatric facility there. There used to be nine medical dormitory beds at Guayama, but the area where those beds are located is also under repairs. Finally, there are 24 medical dormitory beds at Ponce Maximum, but the beds originally were designed to be used as segregation beds, and inmates who are assigned to that medical dormitory refuse to go there thereby jeopardizing their health.

97. The CHP is not in compliance with the standards for provision of chronic illness care, in part because of the shortage of chronic care beds. Moreover, the program cannot control which inmates are assigned to beds in medical dormitories, and the AOC indiscriminately assigns inmates who do not require chronic care to those beds. The AOC simply has no system for determining whether an inmate meets medical criteria for placement in medical dormitories or intermediate psychiatric units.

98. In addition to using medical dormitory beds for nonmedical purposes, the AOC also has used intermediate psychiatry beds for non-medical uses. Although infirmary beds are not included in the census of the AOC general population, medical dormitory beds are included. It would assist the CHP in administering its responsibilities if medical dormitories and intermediate psychiatric beds were excluded from the inventory of beds counted for crowding purposes. The inclusion of these extended care beds in the general population inventory places pressure on the AOC to use the beds for non-health care purposes.

99. The prison system in Puerto Rico also lacks isolation facilities. In order to effectively deal with infectious diseases, the CHP requires protective isolation and respiratory isolation facilities to control outbreaks of diseases like tuberculosis, as well as to comply with OSHA regulations. Isolation rooms should be checked at least every month and the air changes in the rooms should be monitored. Failure of the isolation rooms to work correctly increases the probability of an outbreak of disease among inmates and staff. The infirmary at the Río Piedras complex does have three isolation rooms, but these facilities cannot be used for that purpose because they lack the special equipment required to minimize the risk of spreading diseases to the personnel in the infirmary. In particular, the rooms lack ultra violet lamps, which have never been installed, and the split unit air conditioners and retractors are not functioning. The Ponce Complex also has two isolation rooms in the main institution and four in the maximum security infirmary but they have never been used because the ventilation systems required for such rooms were never installed.

100. The physical facilities on the first and second floors of the hospital at the Río Piedras Complex are unsuitable for their intended purpose. The dental area is very small and more chairs are needed in order to render services to more patients at the same time. Also, there are only two holding cells on the first floor and two on the second floor to keep the inmates awaiting their medical appointments. Each cell holds ten inmates. These are not large enough for the number of patients seen at the hospital. Also, when inmates from different institutions are brought to the clinics, they must be separated from each other for security reasons. Thus, the clinics cannot be used to their full capacity.

101. Both the medical records area and the pharmacy area at the Río Piedras complex are overcrowded, a deficiency pointed out by both the Occupational Safety and Health Administration and the Department of Health. The Department of Health also found numerous other deficiencies during an inspection of the State Penitentiary hospital. For example, the alarm system was broken, warehouses were without smoke detectors, cockroaches were found in different areas, water leak marks on the ceiling and biomedical waste was improperly stored in a room beside the laboratory. Because of these deficiencies, the accreditation of the hospital at the time of the hearing was in jeopardy. If the Department of Health withdraws the accreditation of the hospital, the

ensuing reduction in services would detrimentally affect the entire inmate population.

102. A shortage of beds at the detox area and in the infirmary at the Río Piedras complex makes it impossible to place all inmates suffering from withdrawal symptoms in those areas. Inmates suffering from withdrawal symptoms must therefore be provided treatment through ambulatory services. This situation impacts their health significantly. This same problem exists at the Ponce Complex, which has only 13 infirmary beds. Of approximately 150 admissions to the infirmary each month, around 135 of the patients are suffering from withdrawal symptoms. The shortage of beds means that many of these withdrawal patients must be treated through ambulatory services. This type of treatment is dangerous because such patients suffer from dehydration, blood pressure problems, cardiac problems, mental problems such as change of personality, and they require constant supervision. The Bayamón Complex also suffers from a shortage of infirmary beds with the same attendant problems.

103. The San Juan Correctional Institution, also known as Annex 504 or "Las Malvinas", has two modules that serve as intermediate psychiatric services modules. Mental health patients housed in the intermediate care modules suffer from severe chronic mental conditions and require continuous supervision in order to perform their everyday tasks. These modules at Annex 504 in Río Piedras lack nurses' stations and are located far away from the interdisciplinary team that serves these patients. Thus, the Correctional Health staff rely on custodial officers to escort them into the modules. Because of a constant unavailability of custodial officers, however, the opportunities to provide medical services to inmates in the intermediate care modules are limited. The intermediate care area also suffers from lack of water, which results in unsanitary conditions.

104. The absence of water in the higher floors of the State Penitentiary and Annex 504 diminishes the willingness of inmates to attend clinics and sick call because they cannot bathe or shave. Also, when there is no water in the hospital at the Río Piedras complex, the dental clinics have to be suspended.

105. The Correctional Health facilities at Ponce Main and Ponce Maximum have problems with the air conditioning system each summer. The intermediate psychiatric services areas at the Ponce Complex also suffer from electrical problems which affect the continuity of services to the inmates.

106. The Bayamón Complex also has inadequate physical facilities. For example, dental services must be provided in the same place where sick call and internal medicine clinics are carried out. The number of services rendered results in an enormous volume of patients in a small area. At Bayamón 448, there is no work-space for nursing and medical personnel, thus, the only service rendered at that facility is the delivery of medication. Patients must be taken to Bayamón 308 for treatment and examination. The medical dormitory at Bayamón 1072 lacks the most fundamental amenities of a medical dormitory. There are no ramps for handicapped patients, there is no hot water, and there are no facilities to perform medical examinations within the unit. Although the medical dormitory has a capacity of 36 patients, the AOC houses inmates in the module for security or disciplinary reasons, thus reducing the number of patients who can be housed there for medical reasons. These problems affect not only the health of the medical patients but also their safety. At times, the number of disciplinary cases in the medical dormitory has equaled the number of medical cases. The Bayamón facilities suffer from a lack of adequate sanitation and bathing facilities and a lack of hot water. While undergoing intake evaluation, inmates at Bayamón are housed in dilapidated and unsanitary conditions which the Court personally inspected, along with counsel for the parties.

107. Medical facilities at the Sabana Hoyos Correctional Institution are inadequate, both in terms of space and because the equipment is old and outdated.

108. The lack of space and equipment compromises the medical care provided. In Río Piedras, the lack of space results in a

number of inmates answering health staff's questions in close proximity to each other, thus compromising confidentiality and security.

109. CHP staff have identified 26 patients in the AOC system with antisocial personality disorders, who exhibit symptomatology, at times, of self mutilation, acute brief psychotic episodes or suicidal attempts or gestures. Those patients are extremely disruptive within the system and exhibit highly abusive behavior toward other inmates. Although the CHCC has requested that 26 to 30 beds be designated for these inmates from several AOC administrators, none of them have responded to the requests.

110. The only physical therapy clinic and optometry clinic in the AOC system are located at the Río Piedras Complex. These clinics serve all of the institutions on the island, including patients from privatized institutions. Inmates incarcerated near Río Piedras have more access to the optometry clinic than do inmates located farther from Río Piedras. This is also true for physical therapy clinic. There is only one physical therapist and one optometrist to serve the entire inmate population on the Island. The Río Piedras complex does not have a physiatrist to make referrals to physical therapy. The complex depends on referrals to the Medical Center in Río Piedras.

111. During the intake process at the Río Piedras complex, prisoners receive services at the infirmary and at the PICU. Patients at the different out-patient clinics also receive services at the hospital, located adjacent to the State Penitentiary. All chest X-rays that are ordered at the complex are taken at the hospital. The inmates who are going through the admissions process are housed in modules A–2 and C–2, each with a capacity for 14 inmates, and in modules B–1 and C–1, each with a capacity for 75 inmates. This commingling of inmates and functions in substandard physical facilities delays or impedes the delivery of health care services, causes health hazards, and creates serious unacceptable security conditions.

112. The medical area at the State Penitentiary has only one holding cell with capacity for 10 inmates. This affects the admission process because only ten inmates at a time are allowed to wait their turn for medical evaluations. If more than ten inmates require evaluations, they may not all be seen immediately.

113. The AOC is housing inmates in the admissions area at the Ponce complex even though the inmates are not admission cases since there is no space in the general population cells to house these inmates. The AOC promised the Court that the inmates would be moved. However, they assigned numbers to three cells to use them to expand the housing capacity. This leaves the admissions area with only two cells and a reduced space where newly admitted inmates can be held. This also promotes mixing of newly admitted inmates with general population inmates. At Ponce Main, patients wait to be processed for admission first at the AOC holding cells and then at the Ponce Main holding cells. There are five holding cells at Ponce Main; each has a capacity from 12 to 15 inmates. When these holding cells are overcrowded, the AOC uses the holding cells in the medical area. Sometimes the AOC houses inmates in the medical area's holding cells for four to five days. There is only one bathroom for the five cells and occasionally only one officer to supervise them.

114. Because newly admitted inmates and general population inmates are mixed in the admissions area, inmates from different gangs sometimes come into contact with each other, which creates substantial security problems. Thus, the security of staff and patients is compromised.

115. On the first floor of Ponce Max is an emergency room area and a dental services area. There also is a medical dormitory where inmates with chronic diseases, paraplegics, and persons with physical impediments are housed. The Ponce Max medical dormitory serves the entire Ponce Complex, as well as all the institutions in the southern region of Puerto Rico, including Fort Allen, La Pica, Guayama, and occasionally Mayaguez, located on the West coast of Puerto Rico, and Sabana Hoyos, located in the Northwest part of the Island.

116. In Bayamón, the admissions services are integrated with other medical services. The admission process is carried out in the same place and at the same time as dental, pharmaceutical, internal medicine, and chronic services. Because of the mixing of all these services at the same time and in the same place, inmates from different gangs may come into contact with each other, which results in security problems for the inmates and the medical personnel.

117. Dental services at the Bayamón Complex are offered at Bayamón 308, which also covers dental patients from Bayamón 448. Dental services are offered at Bayamón 1072, where patients from Bayamón 292 also are served. There are no X-ray services available in these areas. The dental services at Bayamón 1072 are rendered in the same area where the delivery of medications and sick call and all internal medicine clinics are carried out. Because so many services are rendered in the same area, the volume of patients is enormous. Because there usually is only one officer available, the medical services director must at times order the suspension of dental services at Bayamón 1072.

118. The medical services provided at Bayamón 1072 are dental, sick call, and internal medicine services. Bayamón 1072 is the only area in the entire complex where emergency services are rendered, together with hospitalization services, infirmary services, and psycho-social intermediate services.

**Equipment and Supplies**

119. Because AFASS fails to pay suppliers, the CHP has not received medical supplies, such as gloves, disposal gowns, office materials, eyeglasses prescribed by the optometrist, and X-ray film. Lack of equipment at some institutions hampers the completion of intake health evaluations.

120. The lack of supplies in the emergency area at the State Penitentiary hospital hampers efforts to provide emergency services. The Bayamón Complex also suffers from a shortage of emergency room equipment. The emergency area at the Ponce Complex has only one gurney.

121. Two years ago an X-ray machine was purchased for the Sabana Hoyos Correctional Institution. Because that institution did not have the appropriate physical facilities in which to install the machine it was sent to the Río Piedras complex, where it was to be installed in the admissions area of the State Penitentiary. The installation of this machine would avoid the problem of transporting newly-admitted inmates at the State Penitentiary to the hospital for chest X-rays. The machine remained in storage for two years, and when it was finally installed in the admissions area, other facilities, however, necessary to use the machine—a dark room, correct lighting and electrical equipment—were not prepared. At the Río Piedras complex, there also are shortages of X-ray film.

122. The CHP also suffers from lack of supplies and materials at the central office level. The infection control program at the CHP does not have the computer equipment necessary to perform its functions. The program suffers from a lack of functioning vehicles, which are necessary to ferry personnel, communications, and supplies between the institutions and the central office and among the institutions.[15] The infectology program cannot perform its job because statistics must be compiled by hand and the CHP does not have an effective inmate tracking system. This results in a very inefficient and too slow a process which is not of much use to the

---

15. In May 1996, the CHP attempted to purchase new vehicles with funds identified in the program's budget. In spite of the approval by the Chief of Staff, Mr. Angel Morey, to the purchase of new vehicles with funds from the program's 1995–1996 budget, and in spite of the availability of funds from that fiscal year's budget, the Secretary of Health required the program to purchase the vehicles with funds from the 1996–1997 budget, which would have had a detrimental effect on that year's budget. In December 1996, the CHP attempted to consummate the purchase of the vehicles for which the bid had been held the prior fiscal year. The dealer who had won that bid agreed to sell the vehicles to the program at the original 1995 bid prices. AFASS, however, refused to allow the program to purchase vehicles with a 1995 date, and required instead that a new bid be put out, which delayed even further the purchase of the vehicles. In March 1997, the Director of the OMB again forestalled the purchase of the new vehicles which the program had been working on for two years.

CHP. The infection control program is not complying with current professional standards of medical treatment because of the difficulty of obtaining accurate statistics. The incompleteness of the infection control program results in an increased risk to the inmate population because the lack of information hinders early treatment of diseases. Moreover, the lack of information makes it difficult for the infectious disease program to make accurate recommendations concerning the control of infectious diseases in the AOC system. The spread of opportunistic infections in AOC institutions can affect staff members as well as inmates, if those staff have compromised immune systems.

123. The lack of ambulances is a widespread problem throughout the AOC system. Although the AOC purchased ambulances for every institution approximately two and a half years ago, the purchase has not resolved the shortage of ambulances because the AOC does not follow the guidelines for using the ambulances that were established by the CHP and signed by the Administrator of the AOC. It took two years for the AOC to forward to the CHP a list of correctional officers who are qualified to drive the ambulances.

### Non–Performance by the Administration of Correction

124. Conditions in some medical dormitories—which are controlled by the AOC-are so bad that inmates in need of treatment refuse to be placed in them, especially when the dormitories are used also to house dangerous or aggressive prisoners. Because inmates refuse to be placed in medical dormitories, and instead reside in the general population, chronically ill inmates who require constant supervision do not receive that supervision and their health is thus endangered.

125. The AOC is also unable to transport inmates to offsite medical appointments. Although the CHP staff is able to obtain appointments for inmates at offsite specialty clinics, AOC staff have been almost uniformly unable or unwilling to take inmates to those appointments. The AOC does not have sufficient vehicles or staff for security or transportation purposes.

126. The Administration persistently transfers inmates from one institution to another without the inmates' files being reviewed by CHP personnel to determine whether the inmates' medical needs can be met at the institution to which the inmate is transferred. Not all institutions offer the same level of care. It would be inefficient and prohibitively expensive to offer the same range of services at all institutions. Thus, the CHP offers greater levels of medical coverage at some institutions than at others. In terms of the placement of inmates, those who suffer from certain medical conditions cannot be transferred to just any institution. For this reason, prior to transferring an inmate, the AOC must first consult with CHP staff to determine if there are medical contraindications for the transfer. The AOC routinely ignores this requirement. In addition, inmates are frequently transferred without their medical files. This represents an unwarranted danger to the health of the inmate if he or she requires a level of medical care that is not available at the new institution.

127. In addition to lack of facilities in AOC institutions, the inability or unwillingness of the AOC to staff the Correctional Psychiatric Hospital together with the history of deficiencies in the budget have prevented the CHP at present from using all of the beds that are available in that facility. Under an agreement between the AOC and the Department of Health, the Correctional Psychiatric Hospital is administered by the CHP, but security and custody are provided by the AOC (the facility houses and treats inmates under the AOC's custody). A study performed by the CHP has determined that there are a number of inmates in the AOC system who currently require hospitalization for mental health conditions but who are not receiving that care as a result of the lack of beds at the Hospital. Lack of space in which to provide treatment for inmates who are acutely psychotic results in profound pain and agony for those inmates. Such inmates are a threat to themselves because they can become suicidal, and to other inmates if they are prone to aggressive behavior. Such inmates also are vulnerable to attacks from other inmates. They disrupt the order of

institutions, thus creating security hazards that must be addressed by AOC staff.

128. Although a number of housing units in AOC facilities are designated as medical dormitories, they often lack the elements necessary for true medical dormitories, such as nursing services areas, ramps for patients, hot water, examining rooms, etc. Because of a lack of infirmary beds, not all patients who require placement in an infirmary can be placed in one. Thus, for example, inmates who require observation during withdrawal from drugs or alcohol abuse may not be held in an infirmary for the necessary time.

129. Lack of coordination with the AOC hampers the completion of sick-call requests, because the AOC cannot provide sufficient numbers of custody officers to escort CHP staff to collect sick-call slips, or else cannot provide sufficient officers to accompany inmates in need of attention to the medical area. The witnesses repeatedly testified to the pervasive absence of officers needed to provide security to health care staff, to move inmates within the institutions and to transport those inmates to their outside treatment appointments or even for emergencies. This situation has reached an acute, critical point and must be remedied at once.

## IV. HARM TO PLAINTIFFS

130. Since 1993, when the current Chief Health Care Coordinator was appointed, until 1995, the Correctional Health Program made remarkable progress in specific areas, to wit: it recruited more and better qualified professional staff; it greatly improved pharmacy services; it expanded the number and types of services provided to inmates achieving the level of care required by current professional standards, and it improved the quality of services provided to inmates. As a benchmark of acceptable professional performance, the Health Care Executive Committee has established 95% compliance with each provision of the Plans as their goal. Unfortunately, deficiencies in the delivery of services to inmates persist, and in some cases these have worsened over the past two years. The progress achieved has dissolved in the face of the obstacles placed in the Program's path.

131. In virtually all key areas that can be measured statistically (including admission evaluations, ambulatory services, sick call, and extra-institutional appointments for subspecialty services), the Correctional Health Program has been unable to achieve a professionally acceptable level of performance. During the last two years, moreover, overall rates of performance have dropped at 11 out of 16 institutions (for purposes of this assessment, each correctional complex counts as one institution). At no institution did overall performance reach the 95% level. The average rate of performance at all institutions dropped from 68.9% during the 1995–1996 fiscal year to 65.2% during the 1996–1997 fiscal year. A further analysis of key services is presented below. Services that are not susceptible to statistical analysis also are currently unacceptable by professional standards of care, as explained in more detail below.

132. In addition, the Program cannot provide consistent and timely access to emergency services for inmates. AOC inmates who are prescribed specialized diets do not receive those diets. There is one optometry clinic and one physical therapy clinic for AOC inmates, but because of the lack of transportation, inmates who are not housed at the same prison where these services are provided do not have access to those services. Neither the AOC nor the CHP has an adequate system for tracking inmates receiving medical or mental health care from one institution to another. Inmates who are transferred, therefore, are at risk for interruptions or delays in their treatment, or even incorrect treatment, which can be and has been fatal. The Correctional Health Program cannot assure that it has adequate medical supplies. Some facilities lack basic equipment necessary for the services required to be given at those facilities. For example, one of the AOC's intake centers at Sabana Hoyos has never had a functioning X-ray machine, which is necessary, among other things, to screen inmates for tuberculosis. Emergency areas in some institutions lack necessary equipment as well.

133. The deficiencies evidenced at the hearing are the result of systematic infirmi-

ties in the correctional health care scheme, which can be characterized as (a) obstructionist interference from and inefficiency within the Department of Health and other government agencies and (b) the lack of cooperation on the part of the Administration of Correction. In brief, the Correctional Health Program has been submerged by a relentless and impenetrable miasma of bureaucracy. As a result, defendants have consistently acted to prevent the CHP from functioning properly in recruiting, contracting for, and retaining essential professional staff as well as in completing the arrangements necessary to ensure access for AOC inmates to community-based emergency, subspecialty, and hospital services. There has not been timely progress toward the renovation and construction of the health care facilities that are needed by the CHP in order to attract and retain all necessary professional staff and to ensure satisfactory and efficient medical and mental health services. The AOC lacks the necessary information systems, classification systems, and administrative capacities and commitment to cooperate effectively with the CHP in ensuring satisfactory and efficient provision and continuity of medical and mental health services.

134. It is extremely difficult to recruit professional personnel to work for the CHP. These difficulties have a number of causes. These include potential recruits' perception that working in correctional facilities is dangerous and the remote location of many correctional institutions. In addition to these issues, a number of other issues make it difficult to retain staff once hired. Among the difficulties in retaining personnel are low pay and the total lack of fringe benefits for contractual personnel, compared to that obtained in the private sector (or other government agencies), inadequate and cramped physical facilities, and lack of up-to-date equipment.

135. Because employment positions with the Department of Health and AFASS pay so little, professionals, such as physicians, physical therapists, and other specially trained health care workers cannot be hired as employees of those agencies. Instead, in order to pay a reasonable and competitive salary, the CHP must hire those professionals as independent contractors, as other health care agencies and programs do, but at times competing agencies are allowed to pay more than the CHP. These contracts must be reviewed and approved by AFASS personnel, but the process of review and approval can take months to effectuate. Because of the uncertainty inherent in waiting months for approval of a contract, health care professionals are reluctant to work for the CHP and those who do tend to leave as soon as they can obtain a position elsewhere.

136. The difficulties in recruiting and retaining staff have prevented the CHP from hiring sufficient staff to provide necessary health care services to inmates. The program never has achieved the acceptable level of staff required according to staffing needs assessments prepared by or for the program. This lack of staff has resulted in actual harm to inmates in the AOC system.

137. Bureaucratic hostility has hampered the provision of medical services in other ways as well. The CHP has had trouble obtaining clinical services because the Secretary of Health has inexplicably and unreasonably terminated contracts with outside reference laboratories.[16] AFASS, on which the

16. In 1993, the CHP contracted with CLENDO Reference Laboratories to provide lab services at Bayamón and Guayama. Because the service provided by CLENDO were satisfactory, the program requested that AFASS put out a bid request for laboratory services and CLENDO was the successful bidder. In April 1995, CLENDO notified the CHP of the need to renew its contract with CLENDO. The renewed contract was to contain some price changes. AFASS balked at renewing the contract and the CHP attempted to obtain AFASS' assistance in putting out a new bid request, while allowing the program to temporarily renew the contract with CLENDO. The contract was renewed pending resolution of these matters. From 1994 to 1997, however, AFASS carried a substantial debt with CLENDO. The debt eventually reached approximately $1,000,000, in spite of numerous attempts by CLENDO to obtain payment for the debt.

The Secretary of Health canceled the CHP's contract with CLENDO Reference Laboratories because she objected to increased prices (which were understood by Program staff to be reasonable) for some services. The Secretary directed, however, that the program could continue to purchase services from CLENDO at open market prices, which resulted in higher overall costs

CHP depends for purchasing and supplies, takes inordinate amounts of time to process bids for basic materials and often fails to pay its suppliers, who understandably cut off supplies until they are paid. Whether they are paid or not is beyond the control of CHP administrators.

138. The conditions established by the evidence have caused actual pain and suffering with no conceivable penological purpose to members of the plaintiff class. Some of the deficiencies have directly resulted in inmate deaths. Delays and interruptions in the treatment of diseases, caused by inappropriate transfers and transfers without medical records, by failure to complete health evaluations upon admission to the AOC system, or by failure to provide unitary doses or to see inmates at sick call or for ambulatory services, all result in the progression of disease or in health conditions' deteriorating to a critical state. Failure to treat inmates with acute psychiatric conditions causes catastrophic pain and suffering to those inmates. Failures to provide intake evaluations result in the spread of contagious diseases that could be prevented if infected inmates are identified in time. Lack of infirmary beds results in inmates suffering from withdrawal symptoms being deprived of a controlled setting for their treatment, thus exacerbating the symptoms and consequences of withdrawal. Failure to provide triple therapy for inmates with HIV reduces the chances of being able to treat the disease effectively, and increases the likelihood of the onset of AIDS. Interruptions in the provision of medications for HIV or for tuberculosis through unitary doses reduces the effect of those medications, at best, and can produce drug-resistant strains of the diseases at worst. Because of lack of access to mental health services and shortages of mental health personnel, an inordinate number of suicides have occurred in AOC institutions over the past two years. These are not generalizations or a calculus of probabilities about the pain and suffering inflicted on plaintiffs, the testimony in the recent hearings indicated that specific inmates have suffered as a result of the deficiencies in the organization of the delivery of health care services, as a causal result of the defendants' policies and decisions:

a. One inmate, who suffered from a schizoaffective disturbance was transferred to a minimum security camp. He arrived at the camp without a medical file and without his medication. The inmate never should have been transferred to the camp, due to his mental health condition, but was transferred by the AOC nonetheless. The same night that he arrived at the camp, he decompensated, entered into an acute psychotic condition, and had to be taken to the Psychiatric Intensive Care Unit.

b. An inmate transferred to Camp Zarzal was admitted to the emergency area there with an acute illness. The medical staff at the camp did not have the necessary supplies to test the inmate for diabetes when he arrived there. Upon being admitted to the emergency area, he was hydrated with dextrose in water. The inmate subsequently died from diabetic toxidosis. The dextrostick was not available at Zarzal, and was not dispatched to the Camp until after the inmate's death because suppliers had not been paid by AFASS and had stopped deliveries.

c. An inmate with high blood pressure, congestive heart failure, and bronchial asthma was transferred from the medical dormitory at Annex 504 to the medical dormitory at Ponce. The patient refused to be housed at Ponce, and was transferred to Annex 448—a general population housing facility—at Río Piedras. After a number of visits to the emergency room at the Río Piedras Complex, the inmate was placed in Cell Block C2 of the State Penitentiary, which is designated as a medical dormitory. Because of the type of crime committed by the inmate, and

---

for the program. The Secretary of Health also recommended that the CHP contract for laboratory services through the Medical Services Administration (ASEM, by its Spanishacronym);

although ASEM could perform the laboratory services, it could not perform the pick-up and delivery services that CLENDO performed.

because he was a sentenced inmate, medical staff had to negotiate an agreement from the inmate leaders at the State Penitentiary that he would not be harmed if he was placed in the medical dormitory. Once medical staff had obtained this agreement from the leaders, the inmate was placed in the medical dormitory, but AOC personnel subsequently transferred the inmate out of the dormitory without medical authorization to Annex 352 where he could not receive the continuous observation he needed. While at Annex 352, the inmate suffered respiratory problems and was admitted to the emergency room at the State Penitentiary, where he died of cardiac arrest.

d. A CT scan of the head and neck was ordered for a patient who was admitted to the Río Piedras Correctional complex in November 1995. The scan was ordered in November 1995 and it wasn't until April 1996 that it was conducted. The patient was released under a diversion program in June 1996, and the results of the scan still had not been received in June. In this case, where a lymphoma was suspected, no more than one week should have elapsed between the time the appointment was obtained and the CT Scan was performed. The delay in this procedure endangered the health and the life of the patient.

e. Because of the lack of a psychologist at the Ponce intake center, an inmate suffering from drug withdrawal at that center committed suicide on May 27, 1997. The inmate had been admitted for a minor crime, but did not receive the standard mental evaluation upon admission because no psychologist was on duty, even though there was supposed to be one. Thus, no one was available to determine whether the inmate was a suicide risk. The inmate also required admission to an infirmary, because of his withdrawal symptoms; had he been admitted to the infirmary, he would have been under 24–hour close supervision. There were no beds available at the time of his admission, however, and he thus lacked not only the mental health evaluation, but also the close supervision he should have received.

f. CHP staff identified a patient at Camp Punta Lima whose PPD test indicated exposure to tuberculosis; because of the lack of isolation rooms in the AOC system, this inmate could not be properly isolated pending determination of his medical status. Because the Río Piedras complex' isolation rooms were not functioning, the inmate was referred to the Humacao Regional Hospital. The hospital, however, returned the patient to Punta Lima without having any tests performed. Because of the persistence of the medical director at Punta Lima, the patient eventually was taken to be evaluated by an internist at the Río Piedras complex. A valisoscopy of the inmate's sputum was performed, and it was determined that the inmate had active tuberculosis. The CHP's epidemiologist visited Punta Lima, and identified 11 inmates who had had contact with the infected inmate, and who had converted to a positive PPD from exposure to the disease.

**The Strategic Evaluation**

139. In 1996, the Health Care Executive Committee conducted a strategic evaluation of the CHP. The evaluation involved all of the members of the HCEC and the office of the court monitor. Participants visited all facilities, interviewed line and leadership staff, and reviewed documents, logs, and records.

140. The strategic evaluation used 1993 as a baseline for comparison of the status of correctional health services, and covered the 1994–1995 and 1995–1996 fiscal years. The HCEC chose 1993 as the baseline because that is when the Chief Health Care Coordinator began working, and also because there really was not a lot of data available for the years prior to 1993.

141. The strategic evaluation identified the strengths and weaknesses of the program. The strengths identified by the evalu-

ation included a significant increase in the number of professionals the program had been able to recruit, that the beginnings of a fragile organized health care system were in place, that substantial progress had been made in implementing an infectious disease program, that the central office staff were working at a high level of competency and as an integrated team, and that data collection, although being done manually, was being performed, that records were legible and well-kept, that services that in 1993 existed only minimally had ben developed, such as dental services, mental health services, health education and infectious disease control, that there was a reasonable preparedness for emergencies and managing medical emergencies, and that the program had established licensing procedures and obtained licenses for its pharmacies.

142. The weaknesses identified during the strategic evaluation included inadequate physical facilities, lack of an information tracking system, lack of integration with AOC personnel, and lack of administrative flexibility. The principal threat identified during the strategic evaluation was the unavailability of resources to develop the Program.

143. At the time of the strategic evaluation in 1996, the HCEC determined that the CHP's strengths outweighed its weaknesses and that the program also had improved its ability to protect the health of the inmates. Unfortunately, the CHP has been losing ground since the strategic evaluation was conducted in 1996. What progress has been maintained is extremely fragile and could regress further if changes of a substantial nature do not take place soon.

144. Currently, the CHP is not in substantial compliance with the Plans. The program has suffered decreases in staffing levels since 1995. There has been no substantial progress in the coordination of medical services between the AOC and the CHP. Not all specialties—medical, mental, dental, etc.—work together because the CHP does not have all the necessary components at all the appropriate institutions. The CHP is not in compliance with the requirement of an integrated appointment system. Various services are available, but inmates do not have access to the services. The CHP cannot complete intake assessments due to insufficient staff and because AOC personnel transfer inmates prematurely. Overall compliance with the objectives for sick call, ambulatory services, admissions evaluations, and extra-institutional appointments fell from 68.9 percent in the 1995–1996 fiscal year to 65.2 percent in the 1996–1997 fiscal year.

145. The CHP has been losing ground over the past two years in its attempts to achieve compliance with the Medical and Mental Health Care Plans. Not only has compliance not been achieved, the situation is deteriorating and is characterized by what the CHCC described as "back sliding from a non compliance position." Even defendants' own expert concedes that inmates in the Puerto Rico prison system are provided with inadequate health care.

**Intake Evaluations**

146. The Correctional Health Program has never been able to complete 95% of intake evaluations.[17] The rate of completed intake evaluations, in fact, has fallen from 76.2% during the 1995–96 fiscal year to 68.4% during the 1996–1997 fiscal year. Intake evaluations are the cornerstone of correctional health services, because identifying inmates' health needs upon entry into the prison system allows health care staff to develop treatment plans for individuals with health needs and to control the spread of infectious diseases within the system. Thus, there are numerous inmates in the AOC system who have not received a complete medical or mental health evaluation. This increases the risk of the spread of disease, and threatens the

17. The Medical Care Plan requires newly admitted prisoners to be received at a small number of designated "regional intake centers" that provide a full range of necessary medical services. Medical Care Plan at III.A.10. The Plan requires "24 hour per day intake medical and mental health screening" (Medical Plan at ¶ III.A.10) and requires that screening to be performed "upon [inmates'] arrival." Medical Plan at ¶ III.B.11. A full health assessment is to be conducted within 7 days. Medical Care Plan at III.B.13. At present the regional intake centers are Río Piedras, Bayamón, Ponce, Sabana Hoyos and Vega Alta.

health of inmates whose conditions require special care, but whose needs have not been identified. In addition to integration of health care services, an inmate tracking system is necessary so that a patient who requires follow-up or further care does not get lost in the process.

147. The AOC frequently transfers inmates out of intake facilities before these evaluations are completed. Thus, the opportunity to treat inmates with infectious diseases before they enter the general population is lost. In addition, inmates who may require a certain level of treatment may not receive that treatment at all, or else the treatment may be delayed. Because of the failure of AOC staff to send inmates' medical files along with the inmates upon transfer. All too frequently the only way that CHP staff become aware of the presence of an inmate in an institution is if the inmate puts in a sick-call slip or is brought to the emergency area.

148. The evaluation is important for the diagnosis of any acute or chronic medical or mental problem, which in turn can forestall potential exposure of others to communicable diseases that can be treated. In addition, the initial evaluation allows staff to determine the correct housing assignment for each inmate. A mental health assessment allows staff to detect inmates with mental conditions and to place them in an environment in which they would be able to function. To identify those people most at risk, the intake period is crucial, because inmates with mental conditions may be vulnerable and unable to protect themselves from other inmates. Inmates with particular health needs must be housed in an institution that has facilities and personnel available for treating those needs.

149. The initial intake screening includes oral inquiry into current illnesses, medications, health problems and conditions and suicidal ideation; taking of vital signs including weight; observation for clinical abnormalities (e.g., behavior, appearance, injuries, deformities, and psychotic behavior); implantation of a skin test for tuberculosis (PPD); and documentation of the patient's disposition (referral to physician, to general popula-

tion, or psychiatric team). Medical Care Plan at III.B.11.

150. The full health assessment includes review of intake screening results, expansion of the medical history, laboratory and diagnostic tests to detect communicable diseases, physical examination, and initiation of required treatment and examination. There are additional requirements addressing the special medical needs of women. Medical Care Plan at III.B.13.

151. Dr. Torres gave a practical description of how the admissions process works. When the inmate arrives at the admissions department, a doctor opens up a medical file and conducts a physical examination. He also conducts a pre-counseling session in which he advises the inmate to authorize an HIV test. On the order sheet, the doctor writes down the tests that he wants conducted. For example, he may want staff to conduct a CBC test, a urinalysis, a VDRL test, chest x-rays, and a tuberculin test. Doctors also conduct dental, mental health and health education screening. Finally, the inmate is given three appointments: one appointment for the reading of the tuberculin test, one appointment to discuss the results of the laboratory tests (two days after they are conducted), including the HIV test if applicable, and postcounseling. And one appointment for the following year for a new physical examination and pertinent lab tests.

152. Noncompliance with these admissions requirements is widespread. Compliance at the five regional intake centers with the requirement that the admissions process be completed within days fell from 76.1% in 1995–96 to 68.3% in 1996–97. At the State Penitentiary at Río Piedras, the rate was 59.6%; at Sabana Hoyos, it was 42.3%.

153. In some cases, failure to complete the admissions process timely simply means that it is completed later. Often, however, it is not completed at all, because the Administration of Correction transfers many patients away from the regional intake centers before the assessment is completed—and in many cases, before the 7 days provided by the Medical Care Plan for the assessment. Medical Care Plan at § III.B.13. Such transfers violate the Medical Care Plan, which requires

(at § III.B.14): "No individual shall be transferred from a regional intake facility until his intake health screening, initial history and full health assessment are completed unless the transfer is to another regional intake center."

154. AOC does not give notice before removing inmates from the intake centers, despite a 1992 court order requiring such notice. These transfers without records occur because AOC does not consult with Correctional Health personnel on all transfers, and when it does consult, it often does not give notice in time to produce the medical record. This practice violates a 1992 order that provides: "Defendants should develop immediately an agreement between the AOC and DOH to ensure that correctional staff notify medical staff of an inmate's impending transfer, so that medical staff can prepare the inmate's medical record for transfer." Order, December 28, 1992, at § XV.2 (Dkt.4166). Official policy states that CHP is to have 72 hours to review inmates' files and recommend for or against transfer, but the policy is not complied with. The CHCC has asked to be given 48 working hours for this purpose, but her request has not been honored.

155. Prisoners who are transferred to another intake center, but not to an intake building—or even to another building in the same complex—may still not receive their admission assessment and may not come to medical staff's attention until and unless they request sick call or a clinic appointment or arrive at the emergency room. Prisoners do not always do this, especially persons who are mentally ill. These prisoners are at particularly great risk of being lost in the system. Persons admitted Friday through Sunday, when certain laboratory services are not available, are particularly likely to be transferred before their assessments are completed.

156. At Ponce, about 66% of newly admitted inmates are removed before 7 days. Some 12% are bailed out, but most are transferred to other complexes or elsewhere in the Ponce complex. Only 33% are completed. If they are transferred within Ponce, medical staff try to find out where they are and

complete the admissions process. In FY 1996–97 at Ponce, 3,604 inmates who were admitted were not evaluated. Of these, 2,044 (56.7%) were transferred before their assessment was completed, and 1,307 (36.3%) were released from prison. The remainder were hospitalized or transferred to other medical facilities.

157. A smaller fraction of Río Piedras prisoners are transferred before the seven days have elapsed. However, other causes have prevented compliance with the admissions requirement at Río Piedras. Compliance reached and exceeded 90% in 1995–96 but then dropped precipitously in 1996–97. The Medical Director cited insufficient medical staffing, high turnover among staff and the attendant disruption, the lack of custodial officers and transportation, shortages of x-ray films, the unavailability of laboratory services on weekends, and for a long time the availability of only one x-ray technician. The shortage of holding cells at the prison hospital, which are usually filled with patients for clinics, delays bringing admissions patients for required x-rays. Sabana Hoyos received a new x-ray machine two years ago for its intake center. However, the area where it was to be installed was never prepared. The machine was then brought to Río Piedras. If installed in the admissions area, it would expedite admissions processing by obviating the need to take prisoners to the hospital for x-rays. But the AOC, which controls the physical plant, has failed to complete the preparation of the Río Piedras site as well. In general, Dr. Guzmán described a situation in which the personal efforts of staff are defeated by the lack of a system.

158. At Sabana Hoyos, staff shortages have been so bad for the year before the hearing (and particularly the last three months) that the prison cannot arrange the necessary physician coverage to conduct admissions assessments.

159. At Bayamón, as of the hearing, admissions assessments were covered only because the doctors work enormous amounts of overtime, 70 to 80 hours a week in Dr. Torres' case and 90 hours or more in that of the director of admissions. The AOC does not provide the medical staff with lists of new

admissions, and in some cases inmates are brought to the admissions area only after the seven days have already passed. Young adult inmates (ages 18–20) are transferred from the ·admissions area to other locations in the complex after no more than 24 hours.

160. At Ponce, problems in recruiting staff have obstructed completion of the admission process. The lack of sufficient escort officer to take prisoners to x-rays delays the process, and AOC uses admissions holding cells as overflow when the prison is overcrowded, which interferes with the medical staff's ability to work.

161. Failure to complete the admissions process poses significant risks to the health of plaintiff class members.[18] Persons with medical conditions requiring treatment may not be diagnosed and treated. Persons receiving medication for chronic conditions may have their medication interrupted, which in some cases may lead to the development of resistance to the medication. Mentally ill persons, if they are not evaluated on admission, may have decompensated by the time they come to the attention of mental health staff. The risk of suicide among prisoners is particularly great during the first 48 hours of incarceration. The presence of untreated mentally ill persons in the population presents risks both to those persons and to others in the prison population, since their disorders may render them either fragile and vulnerable or aggressive, and since their behavior may evoke hostility from other prisoners. Persons with communicable diseases may not be identified and treated, putting other prisoners as well as themselves at risk. The crowded prison environment presents a high risk of transmission of respiratory, skin and bloodborne infections and the correctional population is already a high-risk population for these diseases. Many prisoners requiring drug detoxification are transferred before this process is completed.

### Sick Call

162. The Correctional Health Program never has been able to achieve 95% overall performance in sick-call appointments. The percentage of sick-call requests by inmates that resulted in patients being seen by medical staff in fiscal year 1996–97 exceeded 95% at four institutions (for purposes of statistic, each correctional complex counts as one institution); of the remaining 12 institutions, the rate dropped from the prior fiscal year.

163. The Medical Care Plan requires defendants to "establish a standardized system for the daily handling of non-emergency request for medical or dental care by inmates," ¶ III.C.16, and more generally "to create a system that guarantees accessibility to health care services for all inmates." ¶ II.7, objective (3).

164. Sick call is the gateway through which patients gain access to medical services. To attend sick call, a prisoner fills out a paper request and gives it to a nurse.

165. The percentage of sick call requests honored decreased from 81.3% in 1995–96 to 77.5% in 1996–97, with individual prisons having 1996–97 compliance rates as low as 64.3% (Bayamón), 74.4% (Sabana Hoyos), 69.1% (Ponce), 76.4% (Punta Lima), 78% (Mayagüez), and 68.7% (Fort Allen).

166. The reasons for noncompliance with the sick call requirement include both lack of correctional officers to escort prisoners, T44 (Dr. Torres, referring to 308 at Bayamón), and lack of physicians to conduct sick call. T165–66 (Dr. Ramos) (citing a shortfall of three or four M.D.'s at Ponce, and one recent month when the prison had *no* doctors to cover sick call; at present he has only one physician for sick call.)

167. The percentage of compliance with sick call requirements decreased from 81.3

18. The dangers of noncompliance with the Plan's admission assessment requirements are illustrated by the case of an inmate with a history of mental health problems who was admitted to Ponce on a motor vehicle violation charge at 10:00 p.m. one night in a state of drug withdrawal. There was no psychologist on duty to evaluate him, in violation of the requirement of "24 hour per day intake medical and mental health screening" to be performed "upon [inmates'] arrival." Medical Plan at ¶¶ III.B.10–11. Part of the psychologist's job is to screen new admissions for suicidal tendencies. There was also no room in the infirmary, where this patient would ordinarily have been placed for drug detoxification. He was therefore returned to the intake are, where he committed suicide the next day.

percent in the 1995–1996 fiscal year to 77.5 percent in the 1996–1997 fiscal year.

168. At Bayamón 308, sick call is not carried out on a regular basis because of the lack of officers.

169. Throughout the Río Piedras complex there is a medical area for sick call in each institution. The sick call area at the State Penitentiary is on the second floor, where there are also located the emergency room, the internal medicine clinics, the surgery clinics, X-rays, and the medical records department. Inmates being brought to the area for sick call are strip searched, which discourages inmates from attending sick call.

**Medical Records: Failure to Transfer Records with Patients: Multiplicity of Records**

170. The Medical Care Plan requires: "The complete medical record ... shall accompany all inmates being transferred from one institution to another for housing." V.D.64.g.

171. The AOC consistently transfers inmates without their medical records or without first consulting medical staff concerning transfers. During the 1996–1997 fiscal year, the Administration of Correction transferred approximately 6,394 inmates without transferring their medical records at the same time. When an inmate is transferred without the inmate's medical record, CHP personnel at the receiving institution may not be aware that the inmate has been placed in the institution, and, if they are aware of the inmate's presence, do not know the inmate's medical history or current medical condition. Thus, transfers without medical records can result in interruptions or delay in treatment. If health care staff are not consulted prior to an inmate's being transferred, this can result in inmates with chronic medical or mental health conditions being transferred to an institution that is not set up to offer the services needed by the inmate.

172. In 1966–97, in an inmate population of 11,610 there were 6394 transfers of inmates without medical records.

173. For example, at Ponce in FY 1996–97, 18.54% of inmates transferred into the facility arrived without medical records

(1,098) inmates; 7.87% who were transferred *out* left without records (954 inmates). When an inmate is transferred without a medical record, a temporary record is created. In 1996–97, there were 9400 temporary medical records extant in the system.

174. These transfers without records occur because AOC does not consult with Correctional Health personnel on all transfers, and when it does consult, it often does not give notice in time to produce the medical record. This practice violates a 1992 order that provides: "Defendants should develop immediately an agreement between the AOC and DOH to ensure that correctional staff notify medical staff of an inmate's impending transfer, so that medical staff can prepare the inmate's medical record for transfer." Order, December 28, 1992, at § XV.2 (Dkt.4166). Official policy states that CHP is to have 72 hours to review inmates' files and recommend for or against transfer, but the policy is not complied with. The CHCC has asked to be given 48 working hours for this purpose, but her request has not been honored.

175. Often medical personnel at the transferring prison learn of transfers only when a prisoner whose records are still at the prison fails to appear for an appointment or is not present to receive his unit dose medication. At the receiving prison, medical personnel may learn of the missing records only when the inmate requests services or appears with a medical emergency and no chart can be found.

176. Failure to transfer medical records when the prisoner is transferred is not consistent with the goal of an integrated medical care system.

177. This absence of medical records presents risks to patients that may be life-threatening in some cases, given the wide range of chronic conditions among the population. Patients receiving medications may not receive them timely, which in some cases may lead to relapses and even to development of resistance or to a "rebound" effect of the disease. They may also miss specialty appointments.

178. CHP personnel make informal efforts to locate medical records by communication with CHP offices in the prison the patient was transferred from and notifying the medical records administrator at the central office. Even when this process works, it may take two weeks, and it does not correct all transfers without medical records. It is not a system.

179. One of the strengths of the CHP identified by the HCEC during the strategic evaluation in 1996 was that CHP records were legible and well-kept. Unfortunately, many inmates are transferred between institutions without their medical records. During fiscal year 1996–1997, 6,394 inmates were transferred from one AOC facility to another without their medical records. From July 1996 to July 1997, 18.5% of the transfers received at the Ponce Complex arrived without medical records, and 7% of the inmates transferred from the Ponce Complex to other institutions were sent without medical records. Transferring inmates without their medical records violates the principles of an integrated health system.

180. The failure to accompany inmates with their medical records results from not providing CHP sufficient notice of a pending transfer. This in turn results from the emphasis placed on overcrowding in the *Morales Feliciano* litigation. Inmates are moved constantly to avoid overcrowding, regardless of their condition or handicap.

181. One of the problems in transferring inmates without their medical records is that physicians at the receiving institution may not be able to easily confirm whether an inmate has been prescribed medication. If an inmate receiving medication is transferred without his or her medical record, the continuity of the delivery of the medication can be interrupted. For example, if inmates on triple therapy for HIV infection are transferred without records, and without an effective inmate tracking system, the CHP cannot follow patients from one institution to another; those patients will miss dosages and the efficacy of the medication will decrease. Disrupting the continuity of medications can ultimately lead to resistance to medication. Some medications, if stopped abruptly, cause a "rebound" phenomenon. A transfer without medical records also can result in a missed appointment for treatment or diagnostic intervention.

182. The absence of an inmate's medical record also has critical consequences because patients with emergent medical problems arrive at the emergency room with chronic diseases and mental conditions, yet emergency room personnel do not know of these conditions. In an emergency situation, a patient is exposed to a risk of harm to his health or even his life.

183. Transferring inmates without informing CHP staff means that inmates get "lost" in the system, because neither the CHP nor the AOC have an effective inmate tracking system. CHP staff can sometimes track inmates through the system by using pharmacy records. This informal system was developed internally by CHP staff. This informal system cannot correct all of the problems created by the failure to transfer medical records.

184. Some inmates have more than one medical record. An inmate may have more than one medical record if the inmate is admitted to one institution and then released, and later the same inmate is admitted through a different institution. Unless the inmate informs medical staff of the existence of the prior record, CHP staff may not discover the prior record. The existence of multiple medical records is a potential source of confusion for CHP personnel.

185. When inmates are transferred without their medical records, staff at the receiving institution may not even be aware of the inmates' presence. CHP staff must periodically check AOC inmate movement records to determine if inmates have been received at an institution. Other times, CHP staff discover the presence of an inmate when the inmate shows up for sick call or seeks medical care through the emergency room, or else requests a clinic appointment. Once CHP staff have determined that an inmate is present without a medical file, they must attempt to locate the inmate's institution of origin through the AOC's records, and then request the original medical file. It can take two

weeks to locate and obtain an inmate's medical file. At the sending institution, CHP personnel discover an inmate's absence only after an inmate misses an appointment for medical services or when medical personnel attempt to deliver unitary dosages and find that the patient no longer resides at the institution. While staff at the receiving institution attempt to locate and retrieve the original record, they must reconstruct the inmate's medical history and create a temporary file. This process creates an unconscionable number of temporary records.

186. Patients that are transferred from one institution to another without their medical file are supposed to pass through the medical area in admissions at the receiving institution. CHP staff then open a provisional file, which is used until the medical file arrives. This process creates a duplication of files and taxes the resources of nursing and medical staff. In July 1997, the AOC system had 9,400 temporary medical records.

**Transfers Without Review by CHP**

187. Court orders require that the AOC provide CHP staff with notice that an inmate will be transferred, so that the inmate can be transferred to an institution with appropriate medical facilities. The AOC does not consistently comply with these orders. CHP staff require at least 48 hours' notice that an inmate is to be transferred to review the inmate's record, assuming that they have access to the record, and make a recommendation concerning the institution to which the inmate can be transferred. The CHP's internal protocols establish an optimal period of 72 hours' notice to review the medical file and, depending on an inmate's medical and mental conditions, to approve or disapprove a transfer. This protocol is not consistently followed.

188. Transferring inmates without first allowing medical personnel to review the inmates' files can endanger the health of the inmate. For example, a number of inmates have been transferred to Camp Guavate with chronic medical conditions that cannot be adequately treated at that institution.

189. The AOC sometimes independently of the efforts of the medical staff, places chronically ill patients including patients with HIV, in facilities inappropriate to receive the medical treatment they require. They are transferred to a variety of facilities, camps, or smaller prison facilities, and the input of the medical staff is not utilized. If the transfer of inmates is done without medical input, the disease burden at a given facility will exceed the capability of the resources.

190. Patients with medical conditions requiring close supervision are being transferred to institutions, such as Guavate Camp, which lack a medical dormitory and the appropriate staff or resources to cater to their medical needs. These patients are transferred without their medical files.

191. Camp Guavate does not have mental health staff qualified to treat seriously mentally ill patients, thus those inmates should not be assigned to said penal institution since adequate medical treatment cannot be afforded. Patients suffering major depression, for example, should not be confined at Camp Guavate. Notwithstanding the above, a mentally ill inmate with a diagnosis of schizoaffective disorder was transferred to Camp Guavate without his medical file. His condition deteriorated the same day he was transferred and he had to be returned that same night to the Psychiatric Intensive Care Unit in Río Piedras for evaluation and treatment. Another inmate suffering from major depression was sent to Camp Guavate, without his medical file, posing a risk to his life, since failure to provide adequate mental treatment could have led to suicidal ideation.

192. A patient with a cardiac condition and a major depression history was transferred to Camp Guavate, which lacks the human and medical resources to treat and monitor his medical condition. This inmate takes Visteril and Cumadin-an anticoagulant-and should have blood tests performed regularly to avoid suffering an hemorrhage and a hypobulemic shock which could threaten his life. Because of his physical condition, the inmate should be assigned to a medical dormitory where he could be under close medical supervision. That supervision could not be provided at Camp Guavate.

193. Another inmate suffering thrombocytopenia, a blood disorder which could lead

to hemorrhages, was transferred to Camp Guavate in 1997. He should have been assigned to a medical dormitory. An inmate suffering from uncontrolled juvenile diabetes also was transferred to Camp Guavate. He too should have been placed in a medical dormitory, where his condition could be closely monitored.

194. The CHP is not in substantial compliance with the requirement of performing an admissions assessment; in fact, the CHP never has achieved the 95% completion goal. The percentage of completion of intake health evaluations dropped from 76.1 percent in the 1995–1996 fiscal year to 68.3 percent in the 1996–1997 fiscal year. The primary reason is that inmates are transferred by the AOC before the admission process can be completed. This is in spite of initial signs of improvement shown in 1994 and 1995. The rate of non-compliance with the admission assessment requirements also results from difficulties in hiring necessary personnel and from inmates being removed from intake institutions prior to the completion of their health assessment. In fiscal year 1996–1997, 5,967 inmates were transferred out of intake centers before seven days following their admission. In other instances, some institutions do not have the equipment necessary in order to complete intake evaluations.

195. Between early transfers and early releases, approximately 11,400 out of approximately 28,000 admissions do not complete the admissions evaluation, even though the CHP has begun to invest time and money in performing evaluations of those prisoners. The failure to complete intake assessments has a negative effect on the CHP's attempts to control infections disease. Some inmates could have chronic medical diseases or present symptoms of withdrawal from drugs or alcohol; they can represent a danger to the population and to themselves if not tracked and treated properly.

196. In the Ponce Complex, during the last three years, only 33% of inmates admitted to the institution receive a complete intake evaluation. The remaining 66% are either transferred by the AOC or released on bail before the intake evaluation can be completed. Similarly low percentages prevail at the Bayamón Complex, where the current rate of completion is approximately 50%. There were three months during 1996 at which the completion rate was 0% because of the lack of medical staff to perform intake examinations. Most admissions occur at night. If a physician is not available to cover a night shift, the admission process cannot be completed.

197. The most frequent way in which CHP staff discover an inmate who has been transferred without a complete intake evaluation is when the inmate shows up for sick call or seeks medical care through the emergency room, or requests a clinic appointment. But not all inmates request sick call or other medical care shortly after their admission. Mentally ill patients report to medical areas less frequently than do other inmates. Thus, mentally ill patients are at a particular risk of being lost in the system if they are not given an initial intake evaluation. If an inmate requires mental health treatment but does not receive it, a number of problems can result: the inmate can be very vulnerable to physical abuse by other inmates; the inmate can cause problems for the general population and staff, because the inmate can become disruptive; the inmate diverts attention by prison staff, so that they cannot deal with other problems; failure to treat also causes a great deal of pain for the mentally ill inmate; the inmate can also can be at risk of harming him- or herself.

198. The completion of intake evaluations at Río Piedras in July 1995 was only 30.6%; this was increased to 90% in 1996. The rate fell dramatically, however, after May 1996 to approximately 5%. This decrease results in part from a shortage of physicians. This decrease also results from the lack of custodial officers and the lack of transportation to take patients to the hospital across the courtyard to have X-rays taken. Moreover, there are no laboratory services available during the weekend. A backlog of inmates awaiting lab test results, and when lab services are available again on Monday mornings, there are not enough officers to bring the inmates to the medical area. The failures in the admission process at Río Piedras affect the health of persons admitted to the complex.

The delay in the diagnosis of infectious conditions, chronic mental conditions, and withdrawal symptoms causes the interruption of treatment until admissions staff are able to identify the medical conditions of each patient.

199. The Bayamón Correctional Complex, also lacks physicians to conduct all the admissions evaluations. CHP personnel attempt to deal with this shortage of physicians by assigning doctors to night watch for several days each week. Some physicians, therefore, work 80–hour weeks. As a result of these conditions, the morale of the physicians is being affected, to a point that some are threatening to resign. The AOC sometimes transfers inmates undergoing withdrawal from the admission area to other areas in Bayamón or to other institutions. Frequently, inmates that arrive from the street are placed in the general population before a medical and mental history examination is performed and chest X-rays and labs are taken. This has medical consequences in the general population because a patient could be carrying a communicable disease.

200. CHP staff at the Sabana Hoyos Correctional Institution report that the facility has the lowest compliance of correctional facilities in Puerto Rico in completing intake evaluations. The CHP is practically in total non-compliance with the Plans at the Sabana Hoyos Correctional Institution. The CHCC, over the past four years, has been told a number of times that admissions in the western region of the island will be changed to Guerrero, only to be told on a number of occasions that this plan has changed. This has hampered the development of admission health services at Sabana Hoyos because, if admissions are to be moved to another facility, it does not make sense to devote resources to developing a full complement of admissions services at Sabana Hoyos. Nevertheless, the change to another facility has never been implemented by the AOC.

201. Approximately two years ago, the CHP successfully tested the entire prison population for tuberculosis. At the end of these tests, CHP staff knew who in the AOC system was potentially at risk of developing active TB. This is no longer true because

failure to complete intake assessments has made it impossible to determine accurately the number of PPD positive inmates in the system.

**Failure to Select Medically Safe Housing**

202. Generally, there is no system by which the defendants take into account prisoners' medical condition in making housing placements. Although CHP reviews medical records and makes recommendations concerning proposed transfers to private prisons, there is no such procedure for AOC facilities. Official policy states that CHP is to have 72 hours to review inmates' files and recommend for or against transfer, but this policy is not complied with, and the CHCC's requests for 48 hours for this purpose have not been heeded.

203. In practice, the regional intake centers are the locations that best comply with requirements for chronic patients. The defendants do not concentrate persons with chronic disorders in the regional intake centers. Rather, they disperse many of them to facilities such as camps which do not provide adequate care for such patients and are remote from emergency services. This failure to place chronic patients in facilities with an appropriate level of care is inconsistent with the goal of an integrated system.

**Transportation of Inmates to Emergency Facilities**

204. Many inmates who are brought to medical facilities requiring emergency services must be taken to outside emergency facilities, and for the last six years there have been delays in transportation either from one prison in a complex to another to reach the emergency facilities, or from the prison to an outside hospital. There are problems related to the transfer of inmate patients between services to the various facilities complexes and the regional secondary facility because of either the unavailability of a working emergency vehicle and/or the lack of correctional officers. Delays of up to four hours were reported. The standard of care to prevent morbidity is a fifteen to twenty minute wait for an ambulance. Increased morbidity, deterioration of conditions, increased symptoms

such as pain and suffering are all caused by delays in transporting an inmate to an emergency room.

205. Records show that within the last twelve months, 15 deaths occurred and the record also indicates that inmates are brought to the medical unit by other inmates, which reflects a system completely dependent upon inmates, which can only result in unnecessary deaths.

206. On Saturday, August 2, 1997, during a visit of representatives of the AOC and Dr. John H. Clark, defendants' correctional health expert, to the Bayamón Correctional Complex, an inmate suffered a head injury. This patient was taken to the emergency ward, but due to the neurological changes he was presenting he needed to be transferred to the Medical Center emergency room in Río Piedras to have a CT scan. At that moment there was an ambulance at the emergency area, but there was no officer who could start or drive the ambulance. This delay in transportation to emergency rooms is a common experience if emergencies occur after 4:00 p.m. at the complex. The patient arrived at the Bayamón 1072 emergency ward around 2:00 in the afternoon, and it wasn't until 6:00 p.m. that he was finally transferred to the Medical Center. This patient should not have been more than 15 or 20 minutes in the emergency room waiting to be taken to the hospital. This unacceptable delay in transferring the patient to the emergency room exposed him to a risk of harm or even death.

207. An inmate at Bayamón who suffered left chest trauma presenting a diminished lung sound, pallor and tachycardia was transferred to an outside emergency room almost two hours after the referral to the hospital. This type of delay is not medically acceptable. The delay posed a serious risk to this patient's health, who had a rupture to the spleen which had to be removed. Another inmate at Bayamón with a history of arterial hypertension, congestive heart failure, bronchial asthma and insulin dependence, diabetes mellitus and a history of coagulopathy, who arrived at the prison's emergency room with rectal bleeding, was transferred to the outside emergency room almost 5 hours after

being referred to the hospital. That delay was medically unacceptable. He should have been transferred within 15 to 20 minutes. Also medically unacceptable was a 24 hour delay in transferring an inmate who suffered a fracture of the left hand with a degree of deformity. There was also a 24 hour delay in the case of an inmate suffering a fractured finger. Like the other inmate, he could have developed a deformity and subsequent medical treatment would have been more profound. Another inmate suffering persistent seizures was transferred to a hospital six hours after being referred. This is medically unacceptable and posed a risk to his health for he could have suffered cerebral damage.

208. Emergency transfers between modules inside the institution, and between institutions at the same complex, are also characterized by unacceptable delays. The transfer of an inmate suffering a left and right eye trauma took approximately two hours. The delay could have led to problems with his eyesight. Another example is that of an inmate suffering of trauma to his head and left costal area whose transfer took over two hours. Similarly, there is undisputed evidence on the record of two other inmates suffering head trauma and multiple trauma whose transfer from one module to another inside the institution took approximately two hours. The delay posed a threat to their health.

**Off–Site Appointments and Subspecialty Clinics**

209. Although completion of extra-institutional appointments rose from 60.8% in the 1995–1996 fiscal year to 61.8% in the 1996–1997 fiscal year, that rate of performance is still unacceptable. In addition, 69% of individual correctional institutions suffered a decrease in performance with respect to extra-institutional appointments in the 1996–1997 fiscal year.

210. The Correctional Health Program never has been able to achieve 95% completion in the area of off-site appointments. These appointments are necessary to provide specialized health procedures—such as computerized tomography scans and major surgery—that cannot be provided at the institutional level within AOC facilities. During the

1995–1996 fiscal year, 41.5% of off-site appointments were missed. During the 1996–1997 fiscal year, 38.2% of appointments were missed. The rate of completion of off-site appointments dropped at 11 of 16 institutions from the 1995–96 to the 1996–97 fiscal years (for purposes of this statistic, a correctional complex counts as one institution): the rate did not exceed 81% at any institution, and at most institutions, was below 75%.

211. The program does have an internal process for obtaining and scheduling extra institutional medical appointments, which is somewhat effective. The problem in getting inmates to their medical appointments inside or outside of prison is the result of inefficient custodial escorts. In addition, first priority is given to transporting inmates to court, and the shortage of vehicles results in inmates' not being taken to outside medical appointments. Even if a vehicle is available, there may not be an escort or, if an escort is available, there may not be a vehicle.

212. Under the CHP's internal procedures, a contact at the Río Piedras Medical Center obtains the appointments and faxes them to the CHP's central office, from which point notice of the appointments is communicated to the prisons. Correctional Health staff then notify AOC personnel of the appointment two or three days beforehand. The AOC has never complained to the Chief Health Care Coordinator that it does not receive sufficient notice of inmates' off-site medical appointments.

213. Even when Defendants took direct steps to resolve the problems in taking inmates to offsite appointments, the AOC has not been able to carry through with those efforts. For example, pursuant to a security stipulation, the Chief Health Care Coordinator designated the Río Piedras State Penitentiary as a priority institution, met with officers at that institution, and designed a plan for providing medical escorts. The escorts were assigned for two or three weeks, but suddenly the officers were removed from medical escort duty.

214. Delays in obtaining appointments in off-site subspecialty clinics threatens the continuity of a patient's medical care. At the Río Piedras complex, for example, it can take seven months to get an orthopedic clinic appointment, and if the patient misses the appointment for lack of a vehicle or custodial officer, it can take another six months to obtain another appointment. Extra institutional appointments are delayed and canceled and in some cases inmates may wait months to schedule an appointment. If the appointment gets canceled, it can take a year for the visit to finally take place. These delays are unacceptable and pose a risk to the health and safety of inmates, prolonging unnecessary pain and discomfort. The delays can also cause conditions to deteriorate to a point where they are no longer treatable.

215. At the Ponce Complex, inmates who require subspecialty medical attention are referred to the Ponce Regional Hospital. If that hospital does not offer the necessary specialty, a referral is made to the Puerto Rico Medical Center. The Ponce Complex, however, has serious problems with extra institutional appointments. The Ponce Correctional Complex is not providing inmates transportation to off-site appointments. This problem affects the follow-up of the patient in the outside institution that usually has arranged for a specialist or for a special study. Also, this problem affects compliance with the Plans, because Correctional Health personnel cannot complete the evaluation or treatment of the patient.

216. There is a significant problem with transporting inmates to off-site appointments and in getting timely off-site appointments at the Río Piedras Complex. The Bayamón Complex also suffers from a lack of dependable vehicles and a lack of escort and transportation staff to take inmates to off-site medical facilities.

217. In addition to depriving inmates of health care, the inability of the AOC to get inmates to medical appointments results in wasted resources. The Plans provide that if the delay in getting inmates to outside clinics is more than four weeks following a referral, efforts should be made to provide subspecialty clinics on-site at the prisons. The Chief Health Care Coordinator has attempted to reduce reliance on extra institutional appointments by bringing subspecialists into some of

the prisons. CHP staff found a number of specialists willing to offer clinics in some prisons, but the program could not contract with those specialists for two reasons: first, they wanted to be paid for each clinic they attended, but the program did not have the administrative mechanisms to hire on those terms; second, there is insufficient space at the institutions to hold the clinics.

### Ambulatory Services

218. The Correctional Health Program never has been able to achieve 95% delivery of ambulatory medical services. Ambulatory medical services are general outpatient medical services. The rate of provision of ambulatory medical services fell from 59.6% during the 1995–1996 fiscal year to 57% during the 1996–1997 fiscal year. The highest rates for ambulatory medical services at individual institutions were 94.9% at Stop 8 (an institution with a capacity of 59 inmates) and 99.7 percent at Camp La Pica (an institution with a capacity of 160 inmates). At the remaining AOC institutions (with a total capacity in excess of 12,000 to 14,000 inmates), no institution achieved a rate higher than 74%.

219. Performance in completing ambulatory services dropped from 59.7% in the 1995–1996 fiscal year to 57% in the 1996–1997 fiscal year. Overall compliance with objectives for sick call, ambulatory services, admissions evaluations, and extra institutional appointments fell from 68.9% in the 1995–1996 fiscal year to 65.2% in the 1996–1997 fiscal year. This reduction was echoed at both the Río Piedras State Penitentiary and the Mayaguez Western Detention Center. In addition, at the Ponce complex, mental health ambulatory services and mental health patients are not fully served in terms of their monthly evaluations and their regular medications.

220. The problems experienced by the CHP with respect to ambulatory and extra-institutional medical appointments have a greater effect on persons with chronic conditions.

### HIV+ and AIDS (Triple Therapy); Hepatitis C; Tuberculosis

221. The Program does not provide the current modality of standard medical treatment indicated for HIV and AIDS patients. The treatment termed "triple therapy" is the standard of treatment for many HIV patients. Failure to provide the treatment to those for whom it is indicated increases the likelihood of morbidity and mortality.[19] Approximately 60–70% of HIV or AIDS patients in the AOC system would benefit from triple therapy if it were properly administered. In order to start and properly administer triple therapy for HIV or AIDS patients, three elements are necessary: higher rate of compliance with medication administration, additional staff, and an adequate budget to purchase the drugs and perform testing. Part of the reason for the failure to provide triple therapy is the budgetary constraints suffered by the CHP. Initial and periodic viral load tests, in addition to other types of tests, are necessary, and these all carry their own economic costs.

222. As an initial evaluation of a candidate for triple therapy, the patient's history must be taken, a physical examination made, viral load, CT4 and CT8 analyses performed; CBC measured, and SMA20, a VDRL, a hepatitis profile, and a chest X-ray made.

223. The most important factor to assess in evaluating a candidate for triple therapy is currently the viral load. If an HIV patient does not have any liver or renal disease, the patient should be given triple therapy. It is important to begin the therapy as early as possible to decrease the viral load and maintain the CT4 count (once decreased, the CT4 count does not recover, and the only way to preserve the CT4 count is to decrease the viral load).

224. "Triple therapy" for HIV+ consists of the administration of a combination of antiviral medications. If triple therapy doses are not administered correctly, a patient's HIV infection can develop resistance to the medications included in triple therapy. "Re-

---

**19.** There are a number of patients in the AOC being provided triple therapy. These are limited to those who were receiving the therapy when they were admitted to the system. These prisoners, however, are suffering from the same problems in administration of medication that is experienced throughout the system.

sistance" occurs when an organism develops a mutation that makes it immune to or less affected by a drug. Triple therapy represents a substantial advance in the treatment of people with HIV because it decreases mortality, decreases opportunistic infections, decreases hospital admission rates, decreases viral loads, improves the immune system, and improves the quality of life for HIV patients.

225. To avoid the development of drug resistance by HIV, it is necessary to prescribe more than one medication. Also, the patient must take some medications at strictly prescribed times throughout the day, and cannot miss doses. This requires commitment by the patient, as well as resources by the health provider. For example, some of the HIV medications must be refrigerated.

226. In order for triple therapy medication to be effective, the patient must take at least 90% of the prescribed doses; if less than 90% is taken, the effectiveness will decrease; if less than 60% are taken, the medication has no effect. When unit dosage delivery of triple therapy falls below 90%, CT4 counts will decrease and infections and mortality will increase. As inmates on triple therapy are transferred without records, and without an effective inmate tracking system, the CHP cannot follow patients from one institution to another. Those patients will miss dosages and the efficacy of the medication will decrease.

227. In addition to applying the medications in triple therapy to HIV patients, it is necessary to monitor CT4 counts and viral loads. Patients have to be followed very closely, especially during the first three months of treatment, because of the possible side effects of the medication. The effect of delays on initiation of treatment with triple therapy in AOC institutions will be a higher mortality rate—i.e., patients die sooner than those whose treatment begins earlier—and higher rates of opportunistic infections. As a consequence, hospital admissions will increase. On the other hand, early intervention will reduce mortality and the incidence of opportunistic infections. The delay in treatment with triple therapy also can result in increased spread of opportunistic infec-

tions among the population to inmates with HIV. There also are some diseases, such as tuberculosis, that can spread to people who are not infected with HIV.

228. Hepatitis C also poses a problem in the inmate population. To adequately treat the disease, which is spread by blood contact, it is necessary to spot it as soon as possible. Treatment requires 12 to 18 months of treatment with Interferon. Hepatitis C can lead to carcinoma or cirrhosis of the liver. There is a high prevalence of hepatitis C among the inmate population. The interferon treatment is administered once a day, seven days a week, by injection, which must be administered by a nurse.

229. The procedure for administering HIV test to inmates in the AOC system is to provide them with counseling upon admission to prison, and to ask if they want to be tested.

230. The medication for tuberculosis is applied twice a week. If this frequency is interrupted, the efficacy of the medication will decrease.

231. The lack of an inmate tracking system and the transfer of inmates without medical records also makes it difficult to effectively apply triple therapy, because the CHP cannot follow patients from one institution to another. Those patients would miss dosages and the efficacy of the medication will decrease.

232. Discontinuity in triple therapy treatment can result in a "rebound" effect, in which the HIV virus begins to reproduce much more actively, and to become drug resistant.

233. The procedure for administering HIV test to inmates in the AOC system is to provide them with counseling upon admission to prison, and to ask if they want to be tested. Some inmates refuse to be tested for HIV, however; the reasons for this refusal vary. Some inmates do not want to accept that they are in a high risk group, some already know they are infected, some think they may be infected but do not want to face it, and some patients simply do not want to receive treatment.

### Medication and Unit Dosages

234. Nor has the Program ever been able to achieve 95% successful delivery of unitary dosages of medicine. "Unitary dosages" refers to the administration of individual doses of medication to an inmate with a contagious, deadly, long term or acute condition, directly by health care staff. In certain cases, this is necessary to ensure that an inmate actually takes the medication at the prescribed time. For example, one type of medication to combat HIV must be taken every eight hours to be effective. This means not just three times a day, but actually at the end of every eight-hour period. Failure to adhere to this rigid schedule can render the medication ineffective at best. At worst, it can promote the development of drug resistant strains of HIV.

235. In the system as a whole, the percentage of unit doses actually dispensed decreased from 86.4% in 1995–96 to 85.5% in 1996–97. Individual prisons had 1996–97 compliance levels as low as 84.7% (Sabana Hoyos), 77% (Ponce) 2.3% (Zarzal), and 77.6% (Fort Allen). Exhibit 560. These compliance percentages translate into huge numbers of medication doses returned and not dispensed: 180,761 in 1995–96 and 194,406 in 1996–97.

236. These levels of noncompliance pose serious risks to patients. Patients on psychotropic medication whose mental illnesses is controlled may relapse into an acute phase. Patients taking medications for epilepsy who miss them for three days may revert to chronic/acute phases and have convulsions. Patients on cardiac medication can suffer mild cardiac arrest or can die. The failure to provide medications as prescribed for infectious diseases such as tuberculosis, HIV and hepatitis C may not only constitute ineffective treatment but also may result in the medications becoming ineffective through the development of resistance. Triple therapy for HIV requires a 90% compliance rate to be effective.

237. The issue of returned unit doses has been discussed with nursing staff, taken to executive committee meetings with AOC staff, discussed with area superintendents and with prison superintendents, as well as with the Chief Health Care Coordinator.

238. The failure to complete unit dosages results from a number of factors. Nurses that administer unitary dosages to patients must be accompanied by a custodial officer. Because officers are not available, however, the nurses often cannot take the medications to the housing units. Transferring inmates without their medical records can interrupt the continuity of medication as well, because staff at the receiving institution do not know what diseases or medications are being taken by the inmate who is transferred. Currently, if inmates receiving unit doses are transferred from one institution to another, the nursing staff at the first institution, upon discovering that the inmate was transferred, contacts the infection control nurse, who attempts to locate the inmate at the institution to which the inmate was transferred.

239. The failure to provide unitary dosages to mental health patients results in those patients' relapsing into acute conditions. When this happens, the entire cycle of medication must be started over again, or the patient must be sent to the Correctional Psychiatric Hospital or to the PICU.

### Physical Therapy

240. For a course of physical therapy to commence, there must be a prescription from a physiatrist or an orthopedist. The delay in commencement of a course of physical therapy can perpetuate neurological damage and incapacitate the patient. At the Río Piedras complex, it can take seven months to get an orthopedic clinic appointment, and if the patient misses the appointment for lack of a vehicle, or of a custodial officer, it can take another six months to get a second appointment.

241. The physical therapy area at the Río Piedras Complex has the minimal equipment necessary to provide physical therapy services. But frequently, inmates who are scheduled for therapy do not make their appointments because they are not brought to the facility. Although the physical therapy services provided to inmates who have access to them are adequate, there is only one physical therapy facility in the entire AOC system.

### Diets

242. The AOC does not provide inmates with special medical diets. This has been and continues to be a significant problem. There is nothing resembling a professionally acceptable medical diet program in the Puerto Rico correctional system. The CHP's responsibility with respect to medical diets is fairly limited; it is the AOC's responsibility to actually provide diets to inmates. Because of shortages of funds, the CHP can obtain special nutritional supplements for only the most seriously ill patients. The failure to provide an appropriate diet results in a number of dangers to inmates: chronic illnesses can rapidly deteriorate, diabetics can suffer cardiovascular and neurological damage; people with high blood pressure can suffer damage to blood vessels, the kidneys, brain, heart, and run the risk of stroke.

### Mental Health Services

243. Psychiatric and mental health services have suffered in particular. Psychiatric staff were able to provide treatment to only 25% of the inmates in the AOC system who require such treatment during the 1996–1997 fiscal year.

244. In the system as a whole, approximately 698 of inmates require some form of treatment for mental health conditions who are not receiving that treatment. Of these, 121 inmates require intermediate care, 464 require ambulatory care, an indeterminate number require hospitalization, and others require some other form of care. "Ambulatory" mental health services are those that can be provided on an outpatient basis. "Intermediate" mental health care requires placement in a specialized unit for mental health patients who require more intensive therapy for prolonged periods of time. Hospitalization is required for patients suffering acute psychosis. Currently, there are not enough intermediate care beds available for the inmates who require such care. The CHP also does not have sufficient psychiatric hospitalization beds for the inmates who require such services.

245. About 30% of the inmate population requires mental health services of some sort (excluding addictive disorders) according to the estimates that underlie the Mental Health Staffing Plan. Based on need, the CHP has estimated that its mental health staff reaches about one-fourth of those persons who need care.

246. The need for mental health services has increased since the Mental Health Staffing Plan was adopted. Since then the AOC population has grown substantially, and in recent years there has been a significant increase in the number of acutely mentally ill patients requiring immediate hospitalization upon their admission to prison. T1068–69 (Dr. A.Guzmán); T896–97 (Dr. A.Guzmán) (citing 423 acute psychiatric patients, newly sentenced or pretrial detainees, received from court at Río Piedras in FY 1996–97, increased from 260 the year before; noting that the problem extends beyond Río Piedras); Plaintiffs' Exhibit 526 (showing that in FY 1996–97, of 549 person from the Río Piedras admissions area evaluated at the PICU in Río Piedras, 174 required admission to that unit).

247. Because of concerns about untreated mental illness, the CHP in mid–1997 initiated an "outreach" effort in which mental health staff were taken away from their regular duties and sent into the prison population to look for mentally ill persons. This effort has to date been carried out at the Ponce complex, Vega Alta, and the State Penitentiary at Río Piedras. At these facilities, staff identified some 23 inmates who required intermediate mental health care, 88 who required ambulatory treatment, and 17 who required hospitalization. T884–85, 1071, 72 (Dr. A.Guzmán); Exhibit 559; see T317 (Dr. R. Guzmán) (describing outreach findings at Río Piedras).

248. Based on these results, the CHP has estimated that extending the outreach program to the entire system would yield 121 persons requiring intermediate care, 464 requiring ambulatory care, and 89 requiring hospitalization.

249. Defendants have not been able to provide the appropriate treatment for those persons with serious mental health needs discovered in the outreach to date. Of 17 inmates who require immediate hospitalization, only 6 have been hospitalized because

the defendants, citing lack of security staff, have permitted Dr. Guzmán to open only one of the wards in the Correctional Psychiatric Hospital. The remaining patients have been waiting two to three months for hospitalization. Ordinarily, patients who are identified as needing hospitalization must be admitted' immediately. Some of these patients have been repeatedly referred to the Psychiatric Intensive Care Units when they decompensated. At times there have been as many as 20 patients competing for the 14 beds in the Río Piedras PICU, with the overflow being held in the hallways.

250. No date has been set for opening the additional wards to provide room for these patients (or the dozens of other persons needing hospitalization that will likely be discovered when the outreach effort continues). The psychiatric hospital was to have been opened by July 1, 1993. Mental Health Plan at ¶ II.D.16. The partial opening took place on August 1, 1996.

251. The prison system's mental health staff is far lower than the levels required by the Mental Health Staffing Plan, and the shortfall has worsened rather than improved. Recruitment of mental health staff, especially psychiatrists, is difficult because they are concentrated in metropolitan areas and because the program has great difficulty competing with the private sector, the health reform, and ANSCA, the new addition agency. Salaries are unattractive and persons working on contract receive no fringe benefits.

252. Of a required total of 177.32 full time equivalents mental health staff, the number actually employed reached a total of 94.54 in 1996 but has fallen to 80.6 in 1997.

253. The greatest shortfalls are in psychiatrist and psychologists. Of 35.89 psychiatrists required, the number employed reached a peak of 12.79 in 1995 and fell to 9.9 in 1997. Of 90.14 psychologists required, the program employed 37.27 in 1996, and in 1997 employed 30.8.

254. These shortfalls are further broken down for each professional category among ambulatory, intermediate and admissions services in Exhibits 571–579; T878–80 (Dr. A.Guzmán). In no instance does the number employed in 1997 equal the number required, and in every instance the 1997 figure represents a decline from the previous year. At the hearing, Dr. Guzmán testified that since Exhibit 570 was prepared, the program has lost another three psychiatrists.

255. At Ponce, the psychiatric staff is inadequate, with only one psychiatric assigned to ambulatory services and referrals from admissions and another assigned to the intermediate units. Dr. Ramos testified, "Yes, we don't fully serve the mental health patients, specially in terms of their evaluation month by month and also the medication that has to be served to them."

256. At Río Piedras, Dr. Rafael Guzmán linked inadequate mental health staffing to the failure to evaluate patients and to adjust their medication properly, resulting in deterioration in their mental condition, as demonstrated by the results of the mental health outreach effort. He added that "we are usually brought the patients who have disciplinary problems bu the patient who is depressed, who is isolated, who is not bothering anybody, that patient is not making it to us and we are not making it to them."

257. Untreated mental illness in a prison setting presents risks both to the mentally ill and to those around them in the prison population, since their disorders may render them either fragile and vulnerable or aggressive. There may be physical abuse of the vulnerable mentally ill prisoner by other inmates because their behavior is unruly and their presence is obnoxious. They create management problems for the staff in housing units. Mental illness itself is a catastrophic illness that is extremely painful for the person experiencing it. Some mentally ill persons are at risk of suicide if not treated.

258. Some untreated mental illness results from prisoners' being transferred out of admissions areas before their assessments are completed. In some such cases, the Correctional Health staff are first notified of the patient when he has decompensated.

259. The risks of inadequate mental health staff are illustrated by the case of the patient admitted to Ponce for a motor vehicle

violation, with a history of mental health problems and in a state of drug withdrawal, at a time when there was no psychologist on duty; he committed suicide the next day.

260. The number of suicides in the AOC population has varied from 8 to 11 during the last four fiscal years. This appears to be a high suicide rate. Dr. Shansky testified that in Illinois, there were two or three suicides a year in a population that varied from 25,000 to 30,000. In the District of Columbia, there was previously a high rate (8 or 9 in a population of 1700), but it has been reduced to one suicide in the two years he has been receiver.

261. Defendants' mental health program is deficient in facilities or operations in a number of other respects.

262. Correctional Regional Mental Health Units (CRMHU) are to be established at the regional intake centers. Mental Health Plan at ¶ I.3. Each CRMHU is to maintain a Psychiatric Intensive Care Unit (PICU). There should be 25 beds. In fact, there are only 20 beds in three PICUS: 14 beds at Río Piedras, 4 at Vega Alta and 2 at Ponce. Sabana Hoyos and Bayamón do not have PICU units. Nor have there been PICU beds at Mayagüez, though it was initially designated an intake center.

263. The number of PICU beds in completely inadequate. However, because of the loss of medical dormitory beds because of remodeling, construction defects, and AOC crowding and security demands, the Chief Health Care Coordinator has proposed utilizing one of the presently closed wards of the Correctional Psychiatric Hospital as a PICU and devoting the existing PICU beds to use as medical dormitories in light of the major loss of medical dorm beds to remodeling and AOC crowding and security demands. No action has been taken on this proposal.

264. The Mental Health Plan requires each CRMHU to maintain a psychosocial unit for persons needing intermediate mental health care, i.e., chronic mentally ill persons who do not require hospitalization but must be separated from the general population. Mental Health Plan at ¶ II.C.12. These are patients who *inter ali* must be taught daily living skills, the use of medication, and he to recognize their symptoms and ask for help.

265. While these intermediate units exist, except at Sabana Hoyos, they are not operated consistently with their purpose. In the Río Piedras 504 building, there is a Psychosocial Intermediate Area with two living modules of 24 cells each. However, it is located far from the medical staff and there is no nursing staff in the area. Correctional Health staff must rely on custodial staff to give them access, and sometimes custodial staff are not available, resulting in limitation of services to this vulnerable population. This lack of security coverage is detrimental to the population, since they have chronic psychiatric disorders and need constant supervision to perform the tasks of everyday living. T285–87 (Dr. R. Guzmán); see Plaintiffs' Exhibit 524 (letter from mental health staff to AOC security supervisor, noting dangers of lack of security coverage including other inmates' coming into the unit and selling razors to the mental health patients, some of whom cut themselves with razors). There is also no running water in this unit.

266. Similarly, at Bayamón, the intermediate psychosocial unit, Dorm 5C, lacks adequate correctional staff to supervise the unit, resulting in inability of nurses and other personnel to visit the unit to do their work. Dr. Torres testified that routinely on weekend nights, he would encounter the nurse assigned to the intermediate unit in the medical area rather than at her post because lack of custodial staff meant that she could not get to the unit. As a result, the patients cannot get their medication, most of which is unit doses. This lack of supervision poses risks to the patients' health and safety. Without supervision, there are fights, and there has been sodomy in a population that includes persons with HIV infection. If these patients, whose mental conditions have been stabilized, do not receive their medication as prescribed, they may revert to an acute state. Some of these patients have suicidal ideation. Dr. Torres cited the example of a patient who got out of the unit onto the roof, threatened suicide, and cut himself on barbed wire. This is the kind of behavior that interruption of medication may cause.

267. At Ponce, there is an intermediate psychiatric area for young adults, the only one in the system. The staffing of this unit is inadequate, resulting in harm to the patients and frustration to the staff.

268. In some instances AOC has placed prisoners in intermediate psychiatric areas who do not meet the criteria for placement in them. These areas are carried on the AOC census as if they were general population housing areas.

269. One psychiatric population for whom no provision at all is made is a group, now numbering 26, of persons with severe antisocial personality disorder. These prisoners have long histories of criminal activity and have brief psychotic episodes and depressive episodes with suicidal conduct and acts of self-mutilation. They are not appropriately housed in a psychiatric hospital or an intermediate care unit because their behavior is abusive to other people and disruptive to an intermediate program. They require a secure unit with a solid mental health component and appropriately trained security staff. Dr. Guzmán's requests to successive AOC administrators concerning this population have gone unanswered, except for the present administrator's suggestion that she set up a committee.

270. The CHP cannot provide mental health services to the population that requires such services. During the fiscal year 1996–1997, CHP psychiatrists saw only 6.7% of the inmate population, compared to an estimated 27.2% of the population who require psychiatric services. Thus, CHP psychiatrists saw only 25% of the target population. In real numbers, this means that CHP psychiatrists were able to see only approximately 775 inmates out of an estimated 3,158 who needed psychiatric services. Much of the failure to treat mental health illness in the system results from shortages in mental health staff. The demand for mental health staff has increased within the AOC since 1993, in part because of an increase in the inmate population, but also because of an increase in the number of acute psychiatric cases being admitted from the free community.

271. Out of approximately 177 full time mental health staff required by the CHP in 1993, the program had only 52.5. That number increased to approximately 94.5 by 1996, but fell again during 1997 to 80.6. Out of approximately 51 full time social workers required by the CHP in 1993, the program had only 20.6. This number rose to approximately 45 in 1996, but fell again to approximately 40 in 1997. Out of approximately 90 full time psychology staff required by the CHP in 1993, the program had only 22.27. This number rose to 37.27 in 1996, but fell again in 1997 to 30.8. Out of approximately 35.9 full time psychiatric staff required by the CHP in 1993, the program had only 9.63. This number rose to 12.79 in 1995, but had fallen to below 9.9 by 1997. Out of approximately 134.5 full time ambulatory mental health services staff required by the CHP in 1993, the program had only approximately 32. This number rose to 65.72 in 1996, but had fallen to approximately 58 in 1997. Out of approximately 36 full time social workers required for the ambulatory mental health services of the CHP in 1993, the program had only 15.6. This number rose to approximately 29 in 1996, but fell to approximately 28 in 1997. Out of approximately 65.5 full time psychologists required for the ambulatory mental health services of the CHP in 1993, the program had less than one. This number rose to 26.07 in 1996, but fell to 2.3 in 1997. Out of approximately 32.7 full time psychiatrists required for the ambulatory mental health services of the CHP in 1993, the program had only 7.51. This number rose to approximately 11 in 1995, but had fallen to approximately 9 in 1997. Out of approximately 21.4 full time staff members required for intermediate mental health services in the CHP in 1993, the program had only approximately 12. This number rose to 20.45 in 1995, but had fallen to approximately 13 in 1997. Out of 15 full time social workers required for intermediate mental health services in the CHP in 1993, the program had only 5. This number rose to 15 by 1996, but had fallen to 11 by 1997. Out of approximately 3 full time psychologists needed for intermediate mental health services in the CHP in 1993, the program had approximately 5. This number had fallen to less than 1 by

1997, however. Out of approximately 3 full time psychiatrists needed for intermediate mental health services in the CHP in 1993, the program had only approximately 2. This number had fallen to 1 by 1997. Out of approximately 21 full time mental health personnel required for admissions services in the CHP in 1993, the program had only 8.67. This number rose to 11 in 1995, but had fallen to 9.6 by 1997. (These numbers are stated in terms of full-time equivalents.)

272. Because of limitations in staffing, there is a substantial amount of untreated mental illness in the AOC system. Patients are not being evaluated and their mental conditions are deteriorating. In many instances, psychiatric patients requiring hospitalization have been sent to the psychiatric intensive care unit (PICU) for emergency treatment. After being stabilized, however, they are released to the general population, where they decompensate, requiring that they once again be sent back to PICU.

273. The failure to provide adequate mental health treatment to an inmate can have a number of results: the inmate can be vulnerable to physical abuse by other inmates; the inmate can cause problems for the general population and staff because the inmate can become disruptive; the inmate diverts the attention of prison staff, so that they cannot deal with other problems; the inmate suffers a great deal of psychic pain because of the illnesses affecting him or her. In addition, if the inmate suffers from depression or has suicidal ideation or a history of previous suicide attempts, the inmate can harm him- or herself. Untreated mental illness in an inmate creates the potential for an increase in the number of suicides. In fiscal year 1996–1997, the AOC system had eleven reported suicides: a fact we reiterate because it is utterly unacceptable.

274. Consolidating emergency mental health care services a the Correctional Psychiatric Hospital would allow the CHP to rends better services to the inmate population. If 14 beds at the PICU in Río Piedras can be freed by using the Correctional Psychiatric Hospital for emergency mental health services, then the former PICU beds can be used as medical dormitory beds until other beds are located elsewhere.

**Testimony of Lambert N. King, M.D.**

275. Lambert N. King, M.D., was qualified without objection as an expert in correctional health care and the administration of health care programs, in public institutions, not-for-profit, and for-profit corporations, as well as an expert in health care administration within correctional settings, in medical education and internal medicine. His testimony is not only valuable for whatever contributions he may offer as an expert, but for the comprehensive experience and knowledge he has in this case as an expert witness for almost two decades. He was also a member of the Health Care Executive Committee and participated in the Committee's strategic evaluation of the CHP. The court sets out his testimony separately because we take it to express the plaintiffs' position on the urgency of action by the court and for more intense court supervision in this area. Dr. King's testimony, as always, deserves the court's highest respect and credence.

276. Dr. King emphasized the main objectives that the correctional health system in the Commonwealth's prisons should be aimed at in order to provide adequate health services which will meet constitutional standards. In short, these include compliance with contemporary standards of professional practice, an emphasis on preventive services to the entire inmate population; guarantee accessibility to health care services for all inmates; health education for the correctional population; and monitoring diagnosis and treatment of communicable diseases.

277. Dr. King pinpointed the main obstacles behind the correctional health system's inability to provide or improve the quality of the health services, or even identify and track infectious diseases: (a) budget uncertainty and unpredictability; (b) failure to contract in a stable and predictable manner for required services; (c) relentless bureaucratic and regulatory problems; and (d) the inability to ensure plaintiffs would receive specialized medical care from outside facilities, e.g., emergency, specialized and hospital care.

278. Regarding budgetary deficiencies, monitored by the Joint Health Care Executive Committee during the years 1993 through 1996, he stated: "...it was solid, a solid impenetrable wall of crisis. It was one crisis after another and not only did it have inherent problems ... but diverted the attention of the Correctional Health Program's leadership both in the central office and at the institutional levels such that it markedly compromised their ability to achieve other things that they might achieve." This handicap, which he described as fundamental, must be solved by including advance knowledge of what the budget will be, not only or an annual, but on a long term basis. T. 726. This would eliminate uncertainty in the relationships between the programs outside vendors and health services providers, such as laboratory services and pharmacy services, which must necessarily be interdependent with and have a cooperative working relationship with the program. It would also allow for the integration of the delivery system.

279. As for the administrative problems which have made it unable to function as effectively as it could, Dr. King emphatically stated: "...since 1993 the Correctional Health program and the Chief Health Care Coordinator have been submerged by a relentless and impenetrable miasma of bureaucracy which is another type of problem above and beyond the unpredictable budgets." T. 728. As a result, defendants have consistently acted to prevent the CHP from functioning properly in recruiting, contracting for, and retaining essential professional staff as well as in completing the arrangements necessary to assure access for AOC inmates to community-based emergency, subspecialty, and hospital services. Furthermore, the CHP does not have the types of contemporary information systems that are required to run a complex correctional health program. This is a very significant problem, Dr. King concludes. The bureaucratic inefficiencies confronting the program consume the attention of the leadership staff so that they cannot devote the majority of their time and energy to improve the program. Also money is wasted because the program cannot function with flexibility and the autonomy required.

Therefore the CHP is trapped in a vicious cycle of inefficiency.

280. The budgetary and administrative managerial problems confronting the CHP have made it difficult to retain some of the better staff that have been recruited in the past, and have made it difficult to recruit high quality staff. He proposed the following measures to achieve the medical and mental health plans' objectives: first, to have adequate, stable, and predictable budgets; second, assure the ability to function with a minimal amount of bureaucratic interference; third, leadership of quality and integrity so that the program is identified as a health care organization run and directed by people of the highest caliber in terms of medical and organizational expertise.

281. Dr. King also commented the possible causes and solutions to the systemic problem of failure to hire and retain health care staff. He pointed out that CHP has suffered recruitment problems particularly in the area of psychiatry. Some of the causes relate to professional compensation, which must be competitive with the market place, but such problems also relate to uncertainty about what the CHP will be in the future. That is, about the aegis under which it functions and the degree to which whatever success and vitality that the CHP has relates to the involvement of the Court.

282. Therefore, Dr. King stressed the importance of giving an assured identity and an assured future to the CHP, so that a physician or nurse or health care administrator that considers working for it will know who they are working for and will have some reasonable assurance that they can devote at least a significant portion of the professional life to the organization and program.

283. Regarding systemic problems related to proper, safe and adequate facilities, Dr. King stated that the CHP has been plagued by the types of facilities in which its staff must work. One of the manifestations of the facilities problems confronting the CHP is that the program areas are substandard, unattractive, and nonfunctional in many respects, and lack such things as sinks and private areas for interviewing patients.

Many institutions are haphazardly planned and located so that there is a great deal of inefficiency and waste. Staff cannot communicate or work together effectively and a great deal of time is wasted assuring that patients will be where they need to be at the right time and in the right place. There has been no timely progress toward the renovation and construction for the health care facilities that are needed by the CHP in order to attract and retain all necessary professional staff and to assure satisfactory and efficient medical and mental health services.

284. Far-reaching and relatively drastic measures are required to reform the CHP; these measures require some form of court intervention. To remedy and correct the situation now faced by the CHP, which was preventable, the action required must be stronger than what has been done in the past. The level of court intervention required, which should last a period of years, should be that degree that will assure that the CHP will devote itself to its mission as a health care and public health organization "without being consumed by unnecessary bureaucracy or by lack of any assurance that it will have an adequate budget in the future and by some type of mechanism that will establish the authority and the relative degree of autonomy that experts who can be relied upon will be allowed to carry out their tasks". The objective of an adequate budget process and a sense of relative permanency can be accomplished through a private not-for-profit health care corporation whose primary mission is correctional health care.

## VI. DEFENDANTS AWARENESS OF PROBLEMS

285. The testimonial evidence and massive documentary evidence (together with the long history of this case), leave no doubt that the defendants have been well aware of the problems set out above. With respect to budgeting matters, representatives of the Correctional Health Program, in addition to the Chief Health Care Coordinator, communicated in writing and in person on numerous occasions with the Secretary of Health, who also served as the Executive Director of AFASS. The Chief Health Care Coordina-

tor, in an attempt to resolve budgetary crises, also met or communicated on numerous occasions between 1994 and 1997 with the Governor's Personal Representative and the Director of the Office of Management and Budget. Even after these attempts to resolve the budgetary problems described above, as late as fiscal year 1997–1998, the budgetary request to the Legislature for the Correctional Health Program fell far short of the program's estimated needs. The budgetary problems experienced by the Correctional Health Program have, in addition, been the subject of litigation in the *Morales Feliciano* case. *See,* for example, the discussion concerning plaintiffs' 1995 motion seeking a preliminary injunction. In addition, a letter from the Director of the Office of Management and Budget sent in February 1997 to the Secretary of Health indicates that he was well aware that the issue of adequate funding for correctional health services was a critical issue in the *Morales Feliciano* case. In spite of this fact, the budget request for the Correctional Health Program submitted to the legislature for the 1997–1998 fiscal year fell far short of the Program's needs.

286. Defendants also have been aware of the many problems that hinder efforts by the Correctional Health Program to recruit and maintain sufficient staff. Program personnel sent numerous memoranda to AFASS and the Secretary of Health between 1993 and 1997 describing the difficulties encountered in recruiting staff, requesting assistance in processing contracts for professional staff, in improving benefits and pay for Correctional Health staff, and with other problems experienced by the program.

287. In addition to the foregoing, most of the problems described above have been described in reports of the Court Monitor confirmed by the court and in semi-annual reports produced by the Chief Health Care Coordinator and filed by defendants. *See,* for example, the Seventh Semi–Annual Report concerning correctional health care, which defendants filed in 1993 (Docket # 4620). The need for greater autonomy in the Correctional Health Program was the subject of intense negotiation in 1995 after plaintiffs filed a Petition for Preliminary In-

junction to Compel Defendants to Adequately Fund the Correctional Health Care Program (Docket # 5762). These negotiations culminated in an administrative order that purported to grant the requisite authority to the Correctional Health Program, but which did not accomplish its purpose, which was evident to the Secretary of Health through numerous communications throughout the remainder of 1996 and into 1997.

288. In short, the persistence of the problems described above go beyond deliberate indifference or reckless disregard and can be ascribed to intentional acts on the part of defendants. What is not there is what the defendants have intended and still intend not to be there. It is not a question only of mere administrative incompetence, these are willed, intended results. Prejudice against inmates throughout the prison system and throughout the public health systems is one of the factors that hinders the delivery of health care to inmates.

### CONCLUSIONS OF LAW

### Continuing Violations of Plaintiffs Federal Constitutional Rights

289. The uncontested facts and evidence regarding the present status or conditions of the correctional health delivery system and its administration amply support the conclusion, as a matter of law, that the plaintiff class' constitutional rights have been and continue to be violated by defendants. The record as well as the applicable law reveal that this is not a matter of simple noncompliance or default with Court Orders or Stipulations by the parties. The violations of Federal rights that are in evidence are of constitutional import and relevance as to mandate immediate remedial and injunctive action. A shift on emphasis from mere noncompliance to pervasive and continuous disregard to constitutional rights is mandatory when evaluating the legal impact of the facts supported by the record.

290. Defendants have violated plaintiffs' rights under the Eighth, Fourteenth and Fifth Amendments to the United States Constitution by failing to provide inmates with adequate and reasonable health care. *See*

*Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (*Estelle*).

### The Unnecessary and Wanton Infliction of Pain to Plaintiffs

291. Defendants' acts constitute the unnecessary and wanton infliction of pain and violates the "cruel and unusual punishment" component of the Eighth Amendment.

292. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment". *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (*Helling*). As the Court explained in *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (*DeShaney*):

> "... The rationale for this principle is simple enough: when the State by the affirmative exercise of its powers so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment ...".

Although the Constitution does not mandate comfortable prisons, *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (*Rhodes*); "...neither does it permit inhumane ones..." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (*Farmer*).

293. The prohibition of cruel and unusual punishment contained in the Eighth Amendment to the Constitution of the United States has been made applicable to the Commonwealth of Puerto Rico either through incorporation into the Due Process Clause of the Fourteenth Amendment or as a result of the long history of its application in our District. *Morales Feliciano, et al. v. Romero Barcelo, et al.,* 672 F.Supp. 591, 616 (D.P.R. 1986) (*Morales Feliciano II*). Indeed earlier in this very case, this court emphasized that the Administration of Corrections in Puerto Rico is constitutionally required to provide " 'reasonably adequate [...] shelter,

sanitation, **medical care** and personal safety'" under the Fifth and Eighth Amendments. *Morales Feliciano (II), Id.,* at 619 (emphasis added, internal citations omitted). *See also, Feliciano v. Barcelo,* 497 F.Supp. 14, 33–34 (1979) (*Morales Feliciano II* ). In the present case, the plaintiff class is constitutionally protected under the Eighth Amendment from the denial of reasonably adequate health care. *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392; *Estelle v. Gamble, supra.* In *Morales Feliciano II* the Court, citing *Estelle,* emphasized: " . . . the denial of medical care is cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose." 672 F.Supp. at 617. Moreover, as stated by the Supreme Court in the landmark decision of *Estelle* "in the worst cases, [the government's 'failure to provide medical care for those whom it is punishing by incarceration] may actually produce physical 'torture or a lingering death[.]' " *Estelle,* 429 U.S., at 103, 97 S.Ct. 285 (citations omitted).

294. Applicable constitutional interpretation of the cruel and unusual component of the Eighth Amendment has established that a violation exists when the conditions of confinement "involve unnecessary and wanton infliction of pain", or are "grossly disproportionate to the severity of the crime warranting imprisonment". *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392.

295. The content of what constitutes unnecessary and wanton infliction of pain under the Eighth Amendment derives from " 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . .' ", *Estelle,* 429 U.S. at 102, 97 S.Ct. 285, *quoting from Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir.1968), and from " ' . . . the evolving standards of decency that mark the progress of a maturing society.' " *Id. quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)(*Trop* ). The court in *Morales Feliciano II,* 672 F.Supp. at 617–619, has relied on the high penological standards set up by Article II, §§ 7 and 12 of the Constitution of the Commonwealth of Puerto Rico which prohibits, among others, the death penalty as well as cruel and unusual

punishment. Also, legislative enactments of Puerto Rico's Legislative Assembly specifically require that adequate medical care and hospital services be provided to the inmates as part of the contemporary values of the Puerto Rican society, which give content to the constitutional protection, from wanton infliction of pain embodied in the Eighth Amendment and its Puerto Rican counterpart. *See* 4. P.R. Laws Ann. § 1112(f).

### Defendants Deliberate Indifference to Plaintiff Class

296. In order to prove that the defendants have violated plaintiffs' rights to be free from cruel and unusual punishment, plaintiffs must come forth with evidence sufficient to sustain that defendants acted with "deliberate indifference" toward a federally protected right. In the present case, plaintiffs' proof required a showing that defendants' actions amounted to "deliberate indifference to a serious medical need." *Estelle,* 429 U.S. at 106, 97 S.Ct. 285. *See; Wilson v. Seiter,* 501 U.S. 294, 299–300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (*Wilson* ); *DesRosiers v. Moran,* 949 F.2d 15, 18 (1st Cir.1991)(*DesRosiers* ). The analysis required by the standard of deliberate indifference is two-fold: 1) the **objective** component which looks at the existence of a sufficiently serious deprivation of a "single, identifiable human need" in the present case, adequate medical care); and, 2) the **subjective** component which inquires whether the required mental state of the defendants was present in the deprivation (Was it wanton and unnecessary infliction of pain?). *Wilson,* at 305, 111 S.Ct. 2321; *DesRosiers,* at 18. Plaintiffs must prove that defendants had a "culpable state of mind and intended wantonly to inflict pain." *DesRosiers,* at 19.

297. In order to establish that defendants wantonly and deliberately intended to inflict pain under the deliberate indifference standard of *Estelle,* the defendants' state of mind may be established by " . . . the official's response to an inmate's known needs or by denial, delay or interference with prescribed health care." *DesRosiers,* at 19, *quoting Estelle, supra* at 104–05, 97 S.Ct. 285. Deliberate indifference may also be established in cases where the attention re-

ceived by the inmate is "'so clearly inadequate as to amount to a refusal to provide essential care.'" *Torraco*, 923 F.2d at 234, *quoting Miranda v. Munoz*, 770 F.2d 255, 259 (1st Cir.1985) (*Miranda*).

298. Accidental or mere negligence in the provision of adequate health care to a prisoner is not sufficient for a finding of Eighth Amendment violation. *DesRosiers*, 949 F.2d at 19 ("inadvertent failures to provide medical care, even if negligent, do not sink to the level of deliberate indifference")(citations omitted).

299. The evidence presented by plaintiff class amply satisfies the standards stated above, and amply establishes that defendants' actions constitute deliberate indifference to the plaintiff class' serious medical needs in violation of applicable constitutional provisions. There is substantial evidence that defendants actions or lack thereof has caused or contributed to the deaths of class members and to the infliction of pain and suffering on countless others.

### Systemic Deliberate Indifference

300. In class action cases challenging the entire system, the deliberate indifference standard may be shown, as stated in *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980) *cert. denied* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981): "... by proving repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff ... or by proving there are such systemic deficiencies in staffing, facilities, equipment or procedures that the inmate population is effectively denied access to adequate medical care." *See Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir.1977).

301. "...[S]ystemic deficiencies in staffing, facilities, or procedures [which] make unnecessary suffering inevitable" constitute deliberate indifference. *Todaro v. Ward*, 565 F.2d at 52, *quoting Bishop v. Stoneman*, 508 F.2d 1224, 1226 (2d Cir.1974); *accord, Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *DeGidio v. Pung*, 920 F.2d 525, 529 (8th Cir.1990) (lack of "adequate organization and control in the administration of health services"supported finding of Eighth Amendment violation); *Free v. Granger*, 887 F.2d 1552, 1556 (11th Cir.1989) ("Proof of staffing or procedural deficiencies may give rise to a finding of deliberate indifference"); *French v. Owens*, 777 F.2d 1250, 1254 (7th Cir.1985), *cert. denied*, 479 U.S. 817, 107 S.Ct. 77, 93 L.Ed.2d 32 (1986).

302. The hearing record as a whole supports a finding of such systemic deficiencies in staffing, facilities, procedures, and administration.

303. Defendants have long been perfectly aware both of the level of care required and the level of care actually provided. During the 17 years since the Court's initial grant of relief concerning medical and mental health care, defendants' continued litigation of health care issues has enabled them to become increasingly knowledgeable of both plaintiffs health care needs and of defendants' obligations under the U.S. Constitution. Defendants have failed despite these years of opportunity, encouragement, and coercion to comply with the court's orders and establish a constitutional system of prison health care.

304. Defendants act with deliberate indifference because they are not responsive to the plaintiff class' known needs or when they deny, delay or interfere with prescribed health care due to systemic mismanagement of resources. *Estelle*, 429 U.S. at 104–05, 97 S.Ct. 285; *DesRosiers, supra.* The vast majority of the testimonies reveal that the defendants know and understand plaintiff class' need for adequate and basic health care but continue nonetheless to deny or delay said care wantonly and deliberately due greatly to systemic failures.

305. The combination of individualized and systemic health care conditions amount to a deprivation of prisoners' rights pursuant to applicable constitutional provisions. The Supreme Court clarified that although some conditions of confinement alone could not amount to a deprivation of constitutional rights, others may establish an Eighth Amendment violation "'in combination' when each would not do so alone." *Wilson*, 501 U.S. at 304, 111 S.Ct. 2321. Conditions of confinement "in combination" may support a finding of constitutional violation when the

conditions "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise ...". *Id.* For instance, placing a schizophrenic inmate in a badly overcrowded cell amounts to a "recipe for an explosion" and "death". *Cortes–Quinones v. Jimenez Nettleship,* 842 F.2d 556, 558–560 (1st Cir.1988), *cert. denied,* 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988)(*Cortes–Quinones* ).

306. Similarly, defendants' lack of adequate organization and control in the administration of health services has been noted by the Court of Appeals for the First Circuit in *Miranda,* 770 F.2d at 261, fn. 4: "This is not a case in which it is inconsistent to find liability on the part of both the local prison officials and the central prison administration. A jury could have found that it was the combination of conditions authorized by the Correctional Department [sic] and specific actions taken by the Arecibo Jail Official's which caused plaintiffs' injury" (italics in original). Regarding lack of adequate organization and control in the administration of health services that are tantamount to deliberate indifference, *see also: Todaro,* 565 F.2d at 52; *Harris v. Thigpen,* 941 F.2d 1495, 1505 (11th Cir.1991); *DeGidio v. Pung,* 920 F.2d 525, 529–33 (8th Cir.1990).

307. In addition, defendants have consistently failed to provide adequate sanitation and security to correctional health personnel thereby contributing to the development of hostile and indifferent attitudes toward inmates' overall health needs. The resulting circumstances no doubt amount to deliberate indifference as proscribed under the law.

308. The non-existence of an integral system or unitary institutional structure of administration and delivery of health services denies the plaintiff class or delays their access to necessary medical care in wanton disregard to basic medical and human needs, causing infliction of pain without any penological purpose. Defendants' breakdown of regularity and continuity of services, including medical services, inflicts on inmates psychological and medical harm in wanton disregard of their constitutionally protected right to reasonably adequate health care within contemporary medical standards of professional care. Such systemic deficiencies in the administration of the corrections system, especially the lack of security and the administration of the health care services constitute deliberate indifference and disregard to defendants' legal duties, in violation of the plaintiffs' constitutionally protected right to reasonably adequate health care.

309. The undisputed and uncontested facts of this case support the conclusion that defendants' acts and omissions are deliberately indifferent to basic human and health needs of inmates and that the pervasive and continuous egregious conditions in prison health facilities constitute wanton and unnecessary infliction of pain of the kind specifically proscribed by the Fifth and Eighth Amendments. *Estelle, supra.* Moreover, defendants' reckless indifference to the chaotic, isolated administration and/or mismanagement of health services, constitute daily violations of statutory laws and regulations requiring reasonable medical care and thus, deprive inmates of their liberty without the due process of law as contained in the Fourteenth Amendment. *Cameron, supra.*

**Defendants Violations of the Health Care Required by Applicable Constitutional Standards Is Egregious.**

310. In the present case, the plaintiff class is constitutionally protected under the Eighth Amendment from the denial of reasonably adequate health care. *Rhodes,* 452 U.S. at 347; *Estelle,* 429 U.S. at 103, 97 S.Ct. 285. In the landmark *Estelle* opinion, the Supreme Court concluded that "acts or omissions sufficiently harmful to evidence deliberate indifference to **serious medical needs** of prisoners" violate constitutional standards for it amounted to unnecessary and wanton infliction of pain. 429 U.S. at 106, 97 S.Ct. 285 (emphasis added). The Court of Appeals for the First Circuit has defined that "serious medical need" is one "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention". *Gaudreault v. Municipality of Salem,* 923 F.2d 203, 208 (1st Cir.1990) (citations omitted)(*Gaudreault* ).

311. The "seriousness" of an inmate's medical need may also be determined by reference to the effects of a delay in treatment. *Gaudreault, Id.* at 208. "Serious medical needs" also include conditions that threaten to cause health problems in the future. In *Helling,* 509 U.S. at 32–33, 113 S.Ct. 2475 the Supreme Court established, in the context of involuntary exposure to environmental tobacco smoke (ETS) by inmates, that the Eighth Amendment also protects against future harm to the inmates' health.

312. In this case, the inability of health care personnel to treat Hepatitis C, to administer triple therapy to HIV+ and AIDS patients and to properly isolate cases of active tuberculosis inflicts cruel and unusual punishment on particular individuals at present, endangers their health in the future and threatens the health of all the members of the class. That this happens because defendants cannot provide security to their own personnel is all the more indicative of defendants' recklessness in the face of repeated complaints and reports about this state of affairs.

313. Serious medical needs refer indistinctly to mental and physical ailments. It is well settled law in the First Circuit that the Eighth Amendment also protects against deliberate indifference to an inmate's serious **mental** health and safety needs. *Cortes–Quinones,* 842 F.2d at 560. The extension of the Eighth Amendment protection from physical health needs, as presented in *Estelle,* to mental health needs is appropriate according to First Circuit standards due to the fact that there is " '[n]o underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart.' " *Torraco v. Maloney,* 923 F.2d 231, 234 (1st Cir.1991) (citations omitted)(*Torraco* ).

314. The evaluation of the adequacy of health care revolves around the inquiry of whether the services are " . . . at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *U.S. v. DeCologero,* 821 F.2d 39, 43 (1st Cir.1987)(*DeCologero* ). The standard of care does not include the "most sophisticated

care that money can buy", *DeCologero, Id.* at 42, but only that which is reasonably appropriate "within modern and prudent professional standards" in the field of medicine and health.

315. As the record shows, defendants have continuously acted with deliberate indifference toward the standards of care "within modern and prudent professional standards" by delaying or denying access to medical attention to serious and urgent medical needs of inmates, all this without any penological purpose. *Estelle, supra.* The record is full of instances showing failure by defendants to take the necessary steps to provide access or avoid delay in access to medical and health care as, for example, failure to make provision for triple therapy for HIV+ and AIDS patients; insufficient medical dormitory beds for patients who require close medical supervision; the placement of patients with chronic illnesses in camps that lack the medical facilities they need; unwarranted delay in providing transportation to emergency facilities, and the long delays in scheduling specialty care appointments and the failure actually to comply with them, which constitutes a denial of access to such specialized care. *Waldrop v. Evans,* 871 F.2d 1030, 1036 (11th Cir.1989). *See also, Inmates of Occoquan v. Barry,* 717 F.Supp. 854, 867 (D.D.C.1989) (*Inmates of Occoquan* )(where deliberate indifference was shown by defendants' failure to have a follow up system for treating chronic diseases).

316. The record in this case includes yet other forms of deliberate indifference by defendants to the required standards of professional of care. As the findings clearly reveal, defendants have also neglected to fully screen incoming inmates for infectious diseases such as tuberculosis or to detect mental health problems. Such or similar omissions have been held to violate the Constitution in *Lareau v. Manson,* 651 F.2d 96, 109 (2d Cir.1981); *Inmates of Occoquan, supra; DeGidio,* 920 F.2d at 529–33. The record further evinces that defendants, as a matter of course, fail to inquire into essential facts and fail to conduct routine tests necessary to provide adequate medical care.

Likewise, the record illustrates defendants' failure to inquire about the inmates' prior medical history.

■ 317. Defendants have failed to provide for a sick call system that ensures access to care and that is capable of effectively handling emergencies. By so doing, defendants endanger the lives of the inmates by denying or delaying access to health care. In the Seventh Circuit this type of deficiency supported a finding of deliberate indifference. *See, Bass v. Wallenstein*, 769 F.2d 1173, 1184–86 (7th Cir.1985); *Inmates of Occoquan, supra*, at 867 (deliberate indifference shown by sick call system which relied heavily on medical technical assistants by allowing them to diagnose and dispense medication without proper supervision by trained medical staff).

■ 318. Similarly, the failure to carry out medical orders by neglecting to provide prescribed medication or disregarding special recommendations for surgery or specialized care, when officials are subjectively aware of conditions requiring intervention, is deliberate indifference according to *Mahan v. Plymouth County House of Corrections*, 64 F.3d 14, 18 (1st Cir.1995).

■ 319. Another recognized form of deliberate indifference is "intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 105, 97 S.Ct. 285. Examples of this form of deliberate indifference are the failure consistently to administer "unit dose" medication, the failure to provide transportation to scheduled specialty appointments and physical therapy, and the failure to provide prescribed medical diets.

■ 320. Defendants' manifest inability to adequately train, supervise or retain health care personnel which results in rampant under-staffing and the consequent impossibility to adequately meet the needs of the inmate population constitute deliberate indifference towards the health care needs of the plaintiff class. In *Newman v. Alabama*, 503 F.2d 1320, 1331 (5th Cir.1974), *cert. denied* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975), the Fifth Circuit held that "the inexorable nonattention and delays in receiving treatment attributable to personnel short-ages, the ill-conceived system for referrals of inmates ... from other facilities, and the maladroitly operated 'emergency' referral system also present grave constitutional problems." For a discussion of the nature and consequence of insufficient or inadequate mental health staff. *See Greason v. Kemp*, 891 F.2d 829, 838 (11th Cir.1990); *See also Inmates of Occoquan*, at 868.

■ 321. As the testimony of Dr. Aida Guzmán reveals, severely mentally ill patients (a population that has significantly increased in recent years) continue to cohabit with the general population without being tendered any type of mental health treatment. In *Cortes–Quinones*, 842 F.2d at 560–61, this was found to violate the Constitution. *See also, Inmates of Occoquan*, 717 F.Supp. at 868 (housing mentally ill inmates with punitive segregation inmates violated Eighth Amendment rights of inmates).

■ 322. In addition, defendants' admitted failure to hospitalize inmates whose mental health condition require the therapeutic environment of a mental health treatment facility constitutes deliberate indifference to an inmate's health care needs. *Arnold on Behalf of H.B. v. Lewis*, 803 F.Supp. 246, 257 (D.Ariz.1992).

■ 323. Moreover, defendants have admitted to the repeated failure to timely provide necessary medical care outside their facilities, when not available internally, due in part to lack of personnel or transportation means. Evidence exists on the record showing that delays have endangered the life of inmates. This not only falls considerably short of acceptable professional standards but has also expressly been held to violate the Constitution. *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir.1990); *Inmates of Occoquan, supra*.

■ 324. Constitutional violations by defendants are further evidenced by their failure to provide and maintain adequate facilities and equipment necessary for the provision of adequate health care of inmates pursuant to acceptable professional standards. It is undisputed that defendants have consistently failed to provide adequate sani-

tation and security measures to correctional health personnel, thereby contributing to the development of hostile and indifferent attitudes towards inmates overall health needs. When combined with other constitutional violations, the state of deterioration and unfitness of correctional health facilities and equipment further reinforce the deep-seated deliberate indifference of defendants toward the inmates' constitutionally protected rights. *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir.1989); *Williams v. Edwards*, 547 F.2d 1206, 1216–17 (5th Cir.1977); *Newman*, 503 F.2d, at 1331; *Morales Feliciano It, supra*, at 34.

325. Furthermore, the upkeep, administration and transfer of medical records by defendants is yet another of their indisputable constitutional shortcomings. Defendants have shown a manifest ineptitude in maintaining adequate medical records that are available to health personnel when needed. *Miranda supra*, at 261; *Brown v. Coughlin*, 758 F.Supp. 876, 882 (S.D.N.Y. 1991); *Burks v. Teasdale*, 492 F.Supp. 650, 676 (W.D.Mo.1980); *Inmates of Occoquan*, *supra*. Systemic deficiencies related to management of medical records obstructs good patient tracking within the system, affects the continuity of care and therefore impedes the adequate delivery of health care in violation of the plaintiffs' constitutional rights.

326. In addition, the defendants' failure to provide necessary medical diets has been held as deliberate indifference. *Kyle v. Allen*, 732 F.Supp. 1157, 1159 (S.D.Fla.1990); *Johnson v. Harris*, 479 F.Supp. 333, 336–37 (S.D.N.Y.1979). Budgetary limitations or inadequate resources, as alleged by defendants in this case, can never be a valid justification for constitutional violations as the court has determined. *Morales–Feliciano v. Hernandez–Colon*, 697 F.Supp. 26, 35 (D.P.R.1987).

327. The undisputed facts of this case support the conclusion that defendants' acts and omissions, separately and in combination, are deliberately indifferent to basic human and health needs of inmates and that the pervasive and continuous egregious conditions in prison health facilities constitute wanton and unnecessary infliction of pain of the kind specifically proscribed by the Fifth and Eighth Amendments. *Estelle, supra.* The evidence presented at trial incontestably established that defendants are perfectly aware both of the level of care required and the level of care actually provided. No surprise or ignorance may be claimed before a factual situation that has been well documented since the initial stages of this litigation as corroborated by the decisions previously rendered by this court.

328. A number of specific practices or failings shown by this record are identical or similar to matters that have been held to violate the Constitution. These include:

a. The failure to screen incoming inmates for infectious diseases including tuberculosis. *Lareau v. Manson*, 651 F.2d 96, 109–11 (2d Cir.1981).

b. The failure to provide access to specialized care required by a prisoner's medical condition. *Howell v. Evans*, 922 F.2d 712, 723 (11th Cir.1991) (failure to provide access to a respiratory therapist could constitute deliberate indifference), *vacated as settled*, 931 F.2d 711 (11th Cir.1991); *Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir.) (non-psychiatrist was not competent to evaluate significance of a prisoner's suicidal gesture; prison officials must "inform *competent* authorities" of medical or psychiatric needs) (emphasis supplied), *rehearing denied*, 880 F.2d 421 (11th Cir.1989); *Tillery v. Owens*, 719 F.Supp. 1256, 1307 (W.D.Pa.1989) (services of cardiologist and dermatologist should be provided), *aff'd*, 907 F.2d 418 (3d Cir. 1990).

c. The failure to provide a sick call system that ensures that prisoners receive needed care. *Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1184–86 (7th Cir.1985) (known deficiencies in sick call system supported a finding of deliberate indifference).

d. The failure to provide mental health staff adequate to meet the needs of the population. *Greason v. Kemp*, 891 F.2d 829, 837–40 (11th Cir.1990) (prison clinic director, prison system mental health director, and prison warden could be found deliberately indifferent based on their knowing toleration of a "clearly inadequate" mental health staff);

Cabrales v. County of Los Angeles, 864 F.2d 1454, 1461 (9th Cir.1988) (under staffing such that psychiatric staff could only spend "minutes per month" with disturbed inmates was unconstitutional), vacated, 494 U.S. 1091, 110 S.Ct. 1838, 108 L.Ed.2d 966 (1990), reinstated, 886 F.2d 235 (9th Cir.1989), cert. denied, 494 U.S. 1091, 110 S.Ct. 1838, 108 L.Ed.2d 966 (1990).

e. Leaving severely mentally ill prisoners in general population without mental health treatment. Cortes–Quinones v. Jimenez–Nettleship, 842 F.2d 556, 560–61 (1st Cir. 1988), cert. denied, 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988).

f. The failure to hospitalize prisoners whose mental health condition requires hospitalization. Arnold on Behalf of H.B. v. Lewis, 803 F.Supp. 246, 257 (D.Ariz.1992).

g. The failure timely to provide necessary medical care outside the prison when it is not available within the prison. Kaminsky v. Rosenblum, 929 F.2d 922, 927 (2d Cir.1991) (failure to act on recommendation of immediate hospitalization); Miltier v. Beorn, 896 F.2d 848, 853 (4th Cir.1990) (failure to act on a recommendation for transfer to a cardiology unit); Washington v. Dugger, 860 F.2d 1018, 1021 (11th Cir.1988) (failure to return patient to VA hospital for treatment for Agent Orange exposure); Inmates of Occoquan v. Barry, 717 F.Supp. 854, 867 (D.D.C. 1989) (Eighth Amendment violation found in part because "inmates wait months for appointments to specialty clinics"); United States v. State of Michigan, 680 F.Supp. 928, 1002 (W.D.Mich.1987) (prison officials "may not allow security or transportation concerns to override a medical determination that a particular inmate is in need of prompt treatment and must be transported to an appropriate facility.").

h. The failure to provide adequate facilities and equipment for necessary medical care. Langley v. Coughlin, 888 F.2d 252, 254 (2d Cir.1989); Inmates of Allegheny County Jail v. Wecht, 874 F.2d 147, 153 (3d Cir.1989) (inadequate space for mental health facilities supported an order closing the jail), vacated and remanded on other grounds, 493 U.S. 948, 110 S.Ct. 355, 107 L.Ed.2d 343 (1989); Newman v. Alabama, 503 F.2d 1320. 1331 (5th Cir.1974); Tillery v. Owens, 719 F.Supp. 1256, 1307 (W.D.Pa.1989) (condemning infirmary's lack of space, unsanitary conditions, and deficiencies in equipment and supplies), aff'd, 907 F.2d 418 (3d Cir.1990).

i. The failure to ensure that medical records are available to practitioners treating the prisoner. Miranda v. Munoz, 770 F.2d 255, 261 (1st Cir.1985) (prison officials' knowledge of continuing problem of prisoners arriving at hospital without their medical records cited as a basis for damage liability); Brown v. Coughlin, 758 F.Supp. 876, 882 (S.D.N.Y.1991) ("failure to transfer necessary medical records in a timely fashion" supported a deliberate indifference claim); see Burks v. Teasdale, 492 F.Supp. 650, 676 (W.D.Mo.1980) and cases cited (noting that medical records are essential to continuity of medical care).

j. The failure to provide necessary medical diets. Kyle v. Allen, 732 F.Supp. 1157, 1159 (S.D.Fla.1990); Balla v. Idaho State Bd. of Corrections, 595 F.Supp. 1558, 1574–75 (D.Idaho 1984); Johnson v. Harris, 479 F.Supp. 333, 336–37 (S.D.N.Y.1979). The facts of this case indisputably sustain the conclusion that defendants have deprived and continue to deprive the plaintiff class of reasonably adequate health care within modern and prudent professional standards of care. The vast majority of the testimonies reveal that the defendants know about the plaintiff class' need for adequate and basic health care but continue to deny or delay said care wantonly and deliberately due to systemic failures. Yet, defendants' reckless and deliberate indifference the chaotic, isolated administration and/or mismanagement of health services, constitute daily violations of statutory laws and regulations requiring reasonable health care and thus, deprive inmates of their liberty without the due process of law as contained in the Fourteenth Amendment. Cameron, 990 F.2d at 18.

329. Defendants' chaotic and arbitrary administration of the correctional health system, the absence of standards and daily violations of statutory law in the area of health care as well as the failure to provide for proper sanitation or a safe environment, have

also produced a deprivation of liberty interests of inmates without due process of law under the Fourteenth Amendment to the Constitution of the United States, as ruled by this Court since 1980 and specifically on 1986. *Morales Feliciano I*, 497 F.Supp. at 18 (1980); *Morales Feliciano II*, 672 F.Supp. at 620–621. According to applicable case law from the Court of Appeals for the First Circuit, the Due Process Clause of the Fourteenth Amendment prohibits a state from extending an inmate's detention indefinitely and limits the state's capability to worsen an inmate's condition. The Due Process clause mandates a state to balance the competing demands and interests properly after which a state correctional facility may not choose alternatives or provide for circumstances that unwarrantedly lengthen an inmate's term. *Cameron v. Tomes*, 990 F.2d 14, 21–22 (1st Cir.1993)(*Cameron*). The plaintiff class has brought forth ample evidence that it has a cognizable claim under the Fourteenth Amendment since the defendants' "ordinary procedures and constraints affirmatively and needlessly worsen their mental health condition, such that members of the class might well be confined long after their sentences" expire due to the wanton and reckless infliction of pain and suffering during their imprisonment. *Cameron, Id.* at 18.

330. This court's conclusions are not altered by the undoubtedly sincere good intentions expressed on the witness stand by the outgoing Secretary of the Treasure, nor by the commitments he made as the Governor's expressly authorized representative, nor by the assurances of defense counsel on behalf of the government, nor by actions taken in the weeks before the hearing. The court has heard such professions before, and after the passage of years of noncompliance, the dispositive factor must be the long-standing failure to achieve compliance. *See Dixon v. Barry*, 967 F.Supp. at 553–54 (activity and promises of improvement in response to receivership motion are insufficient to avert appointment of a receiver); *LaShawn A. v. Kelly*, 887 F.Supp. at 315 ("While it is true that the defendants have made some progress in various areas, the [court's] factual findings show the urgent need for a new, more fundamental approach to change. Oth-

erwise, each report of incremental progress will be mitigated by regression in another area or future inaction on that first step forward. Much of the progress originally made is now slipping back into the same tired way of doing business that brought these parties before the Court."); *Wayne County Jail Inmates v. Wayne County Chief Executive Officer*, 444 N.W.2d at 560 (same conclusion as to "flurry of compliance activities" in response to receivership motion).

331. The facts the court has found in this case, are supported by ample evidence, and show without doubt that the defendants in this case have failed in their constitutionally required obligation to provide inmates reasonably adequate medical care, as well as reasonably adequate shelter, sanitation and personal safety, under the Eighth, Fifth and Fourteenth Amendments to the Constitution of the United States. As result, the plaintiff class is entitled to continued federal injunctive relief for the protection of their constitutional rights.

### *REMEDY*

332. Therefore the court holds that it is necessary, to protect the members of the plaintiff class from cruel and unusual punishment through constitutionally unacceptable health care services, to continue in full force that part of the Order Directing Partial Judgment filed January 22, 1996, (Dkt.6091) and the Partial Judgment entered on January 24, 1996, (Dkt.6093) which relates to health care. This remedy extends no further than is necessary to correct the violation of the Federal rights of members of the plaintiff class. The court finds that such relief is narrowly drawn and certainly extends no further than is necessary to correct the violation of plaintiffs' Federal rights. There is no less intrusive means to correct the violation of plaintiffs' Federal rights.

333. The court further finds that the conditions described above are a danger to public health and security and that Puerto Rico's criminal justice system can only be improved by the implementation of the court's prior orders and judgment. Cost saving efficiency and institutional security will result from the

implementation of those orders and judgment.

334. The court at this time will not decide whether or not to appoint a receiver, and under which circumstances and conditions such a receiver can and should be appointed. But the court must take the necessary steps to assure that its orders and judgment are obeyed and that the violations of plaintiffs' Federal rights cease. To do so the court will build on the remedial structure that is already in place.

335. The Medical Plan at paragraph 49, page 20 established that

Within 90 days, the DOH shall prepare and submit to the Central Personnel Office (OCA) a reimbursement schedule for physicians, dentists and nurses whose services are required to achieve the purposes and objectives of this Medical Care Plan. The schedule, a copy of which shall be filed with the Court, shall take into consideration travel allowance, malpractice insurance, and continuing medical education. *The reimbursement schedule for professionals shall be at a level sufficient to recruit and retain qualified professional staff including specialists.* (Emphasis added.)

336. The parties have jointly requested an order to allow the Chief Health Care Coordinator untrammeled authority to process.

337. The Hon. Manuel Diaz Saldaña, then Secretary of the Treasury, now Comptroller of Puerto Rico, deprecated the ruling by the former Comptroller that the Correctional Health Program could not contract "on-call" physicians. He also stated that the delays on requesting bids and awarding contracts were unacceptable.

338. In their Joint Proposal Concerning the Correctional Health Program of September 26, 1997 (Dkt.6673) at paragraph 12, pages 7–8, the parties agreed that

The success of any effort to provide constitutionally-mandated health care to the plaintiff class will require coordination and support from the Administration of Correction. In 1994, the parties incorporated into the *Stipulation Regarding Custodial and Sociopenal Staffing* (Docket # 5241) a provision that defendants would "assign a permanent cadre of medical security personnel to occupy intra-institutional escort posts, extra-institutional escort posts, and general medical security posts, which include manning medical dormitories, medical areas, psychiatric care centers, and drug abuse treatment areas." It is crucial that the provisions be implemented as part of the overall solution to the health care problems confronting the plaintiff class. The implementation of these provisions will require that the following steps be taken in preparation:

a. The Executive Director of the CHP and the parties will confer with consultants to determine the selection, training, and qualifications necessary for a medical cadre.

b. The recruitment and training of the medical cadre must be coordinated with the Administrator of Correction.

c. A specialized training program for the officers who will make up the medical cadre (and for those officers who will be assigned to the cadre in the future) must be developed.

d. The parties will respectfully request that the Court provide necessary funding for developing the cadre and one year of supplemental compensation for the members of the cadre, in addition to the regular salary paid by AOC, with the understanding that following that first year, defendants will be responsible for paying any differential accorded to the members of the cadre.

339. In the same Joint Proposal the parties agreed upon a schedule for setting up the private not-for-profit corporation proposed by plaintiffs and embraced by defendants. So far the court has been advised at an informed status conference only that the incorporation papers have been filed with the Department of State of Puerto Rico. Every

other deadline on the parties' joint submission has gone by with no action that the court is aware of. The court is particularly concerned about budgeting and not less concerned about the proposed not-for-profit corporation.

340. The court will at this time take interim measures and pursue the path which it deems necessary to protect the plaintiffs' rights and take some of the steps proposed by the parties. The court expects obedience now. The parties are all on notice that should the court be disappointed in its rightful expectations, it will not hesitate to reach the ultimate issues raised in this matter.

IT IS NOW ORDERED AND ADJUDGED that the Partial Judgment entered on January 26, 1996, be continued in full force and effect with respect to all health care issues, and all orders set out in the Order Directing Partial Judgment be also continued in full force and effect. And it is further

ORDERED that the Joint Health Care Coordinator shall submit directly to the court, over her signature, and to counsel for the parties, as soon as feasible, a compensation scale for Correctional Health Program employees, which meets the criteria of the Medical Health Plan set out above, including compensation for "on-call" physicians. This compensation scale should be implemented for the present contracting cycle. And it is further

ORDERED that counsel for defendants, through the Attorney General if necessary, shall seek a reconsideration of the Comptroller's ruling on "on-call" physicians. And it is further

ORDERED that the Chief Health Care Coordinator shall submit to the court, as soon as practicable, over her signature, and shall serve on counsel for the parties, an itemized list, with the approximate cost of all vehicles needed by the Correctional Health Program. And it is further

ORDERED that within thirty (30) days of the entry of this order the Executive Director of the Correctional Health Program shall submit to the Administrator of Corrections a detailed schedule of the Program's security staffing needs, including ambulance drivers and drivers and escorts for transportation medical appointments outside the institutional setting. The Administrator of Corrections shall meet with the Program's Executive Director and counsel for the parties within five (5) working days of receipt of the Executive Director's communication to discuss the development and implementation of the medical cadres agreed upon by the parties. Counsel for the parties are directed to inform the court in writing of any progress or obstacles they meet with in the implementation of this agreement. The court deems this a matter of the greatest urgency. And it is further

ORDERED that within thirty (30) days of the entry of this Opinion and Order the Chief Health Care Coordinator will submit a report to the court over her own signature, and serve upon counsel for the parties, to inform the court on progress or obstacles the Program has encountered in the present administrative arrangements concerning payroll, services contract payments, acquisitions, bidding procedures, etc. The Chief Health Care Coordinator shall also include the Program's budgeting expectations, based on the information provided to her or to the Executive Director. The Chief Health Care Coordinator shall specifically address the budgetary needs for mental health care and the full operation of the Correctional Psychiatric Hospital, HIV+ and AIDS triple therapy and Hepatitis C treatment. And it is further

ORDERED that within ten (10) calendar days of the entry of this Opinion and Order counsel for the parties shall inform the court in writing of the progress made in organizing the not-for-profit corporation.

IT IS SO ORDERED.